# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| **MATTHEW JOHN HEATH,** ) | |
| ) | |
| ) | |
| **MATTHEW JOHN HEATH, as the guardian of** ) | |
| **I.M.H., a minor,** ) | |
| ) | |
| ) | |
| **ROBERT JOHN HEATH,** ) | |
| ) | |
| ) | |
| **CONNIE DEMETA HAYNES,** ) | |
| ) | |
| ) | |
| **DEVIN EDWARD WALLER,** ) | |
| ) | |
| ) | |
| **MCKENZIE CONNEAL DANIELS,** ) | |
| ) | |
| ) | |
| **OSMAN IMRAN KHAN,** ) | **COMPLAINT** |
| ) | |
| **TANIA YUDITH VALDES,** ) | **Civil Action No. 1:25-cv-20040** |
| ) | |
| ) | **JURY TRIAL** |
| **JASMIN YUDITH KHAN,** ) | **DEMANDED** |
| ) | |
| ) | |
| **TANIA YUDITH VALDES, as the guardian of** ) | |
| **A.I.K., a minor,** ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **NICOLÁS MADURO MOROS,** ) | |
| ) | |
| ) | |
| **FUERZAS ARMADAS REVOLUCIONARIAS** ) | |

**DE COLOMBIA-EJÉRCITO DEL PUEBLO** )
**("FARC-EP"),** )
)
)
**CARTEL DE LOS SOLES** )
**("CARTEL OF THE SUNS"),** )
)
)
**SEGUNDA MARQUETALIA,** )
)
)
**VLADIMIR PADRINO LÓPEZ,** )
)
)
**NÉSTOR LUIS REVEROL TORRES,** )
)
)
**TAREK WILLIAM SAAB HALABI,** )
)
)
**IVÁN RAFAEL HERNÁNDEZ DALA,** )
)
)
**DIOSDADO CABELLO RONDÓN,** )
)
)
**ALEX NAIN SAAB MORÁN,** )
)
)
**JOSÉ MIGUEL DOMÍNGUEZ RAMÍREZ,** )
)
)
**CILIA ADELA FLORES DE MADURO,** )
)
)
**REYNALDO HERNÁNDEZ,** )
)
)
**MARLON SALAS RIVAS,** )
)
)
**ALEXANDER ENRIQUE GRANKO** )
**ARTEAGA** )
)
)
**PETRÓLEOS DE VENEZUELA, S.A.,** )

|                                              |     |
|----------------------------------------------|-----|
|                                              | )   |
|                                              | )   |
| **COMPAÑÍA GENERAL DE MINERÍA**              | )   |
| **DE VENEZUELA, aka CVG COMPAÑÍA**           | )   |
| **GENERAL DE MINERÍA DE VENEZUELA**          | )   |
| **CA aka CORPORACIÓN VENEZOLANA**            | )   |
| **DE GUAYANA MINERVEN C.A. aka**             | )   |
| **CVG MINERVEN aka MINERVEN**                | )   |
|                                              | )   |
|                                              | )   |
| **Defendants.**                              | )   |

---

## <u>COMPLAINT</u>

Plaintiffs bring this action seeking justice for the kidnapping, captivity, interrogation, torture (including solitary confinement), and defamation of American citizens Matthew John Heath ("Matthew Heath") and Osman Imran Khan ("Osman Khan"). Venezuelan officials held Matthew Heath and Osman Khan in wrongful captivity—for 752 days and 259 days, respectively—until the men could be leveraged as collateral against the United States by Defendants in a prisoner exchange on October 1, 2022. Matthew Heath, Osman Khan, and their families seek recompence for the injuries and suffering caused by the actions alleged herein and committed by Defendants: Nicolás Maduro Moros; Cilia Adela Flores de Maduro; Tarek William Saab Halabi; Iván Rafael Hernández Dala; Fuerzas Armadas Revolucionarias de Colombia - Ejército del Pueblo; Cartel de los Soles ("Cartel of the Suns"); Segunda Marquetalia; Vladimir Padrino López; Néstor Luis Reverol Torres; Diosdado Cabello Rondón; Alex Nain Saab Morán; José Miguel Domínguez Ramírez; Reynaldo Hernandez; Marlon Salas Riva; Alexander Enrique Granko Arteaga; Petróleos de Venezuela, S.A; and Compañía General de Minería de Venezuela, a.k.a. CVG Compañía General de Minería de Venezuela CA, a.k.a. Corporación Venezolana de Guyana Minerven C.A., a.k.a. CVG Minerven, a.k.a. Minerven (collectively referred to hereinafter as "Defendants" or "the Maduro Criminal Enterprise"). Plaintiffs seek monetary damages under the Anti-terrorism

Act (ATA), 18 U.S.C. § 2333(a), the Torture Victims Protection Act, 28 U.S.C. § 1350, note, Civil RICO, 18 U.S.C § 1962, and claims for false imprisonment, intentional infliction of emotional distress, and defamation.

## I. INTRODUCTION

1. On September 9, 2020, the Maduro Criminal Enterprise kidnapped Matthew Heath during his attempted travel from Colombia to Aruba and wrongfully held him captive for 752 days thereafter.

2. On or about January 15, 2022, the Maduro Criminal Enterprise kidnapped Osman Khan on his way to meet his girlfriend's family in Venezuela and wrongfully held him captive for 259 days thereafter.

3. Matthew Heath and Osman Khan were detained in Venezuela's notoriously inhumane and unsanitary military prisons. During their wrongful captivity, the men's captors tortured them for days on end, including by means of electrocution, suffocation, severe beatings, food and water deprivation, and isolation in solitary confinement.

4. On multiple occasions, Matthew Heath's captors forced him into a contraption referred to as "El Tigrito," a common slang term in Venezuelan prisons for a type of punishment cell.

5. At least twice, Directorate General of Military Counterintelligence ("DGCIM") Agents, acting under orders from the Maduro Criminal Enterprise, stripped Matthew Heath naked to humiliate and torture him: in one instance, to lock him in a room kept at freezing and/or extremely cold temperatures; in another, to pour ice water over him and threaten him with rape at gunpoint.

6.      Similarly, Osman Khan's captors repeatedly waterboarded him, forcibly injected him with medication that caused seizures and paralysis, and on at least one occasion, doused him with water and locked him in a frigid cell. Mr. Khan too was subjected to torture inside El Tigrito.

7.      Meanwhile, Matthew Heath's and Osman Khan's family members endured fear, stress, and helplessness as their loved one was held hostage by a dangerous narco-terrorist group.

8.      Matthew Heath's family members—parents Robert John Heath and Connie Demeta Haynes, siblings Devin Edward Waller and McKenzie Conneal Daniels, and minor son I.M.H.— each suffered intense emotional and mental anguish while the Maduro Criminal Enterprise held their loved one hostage.

9.      Osman Khan's family members—mother Tania Yudith Valdes, and siblings Jasmin Yudith Khan and A.I.K.—each suffered intense emotional and mental anguish while the Maduro Criminal Enterprise held their loved one hostage.

10.     Matthew Heath and Osman Khan were targeted by the Maduro Criminal Enterprise specifically because they were Americans.  The kidnapping, torturing, and ransoming of American citizens was part of a continuous and systematic scheme to coerce the United States government into policy concessions, the end of an oil embargo, and prisoner swaps.

11.     On October 1, 2022, the Maduro Criminal Enterprise released Matthew Heath, Osman Khan, and five other U.S. citizen hostages in exchange for two men, nephews of Nicolás Maduro and Cilia Flores, who were incarcerated in the U.S. for crimes they committed in service to Defendants' narco-terrorist scheme.

12.     Each Defendant directs or otherwise serves the Venezuelan narco-terrorist scheme, including by trafficking drugs through Venezuela into the United States (and especially Florida), laundering drug proceeds through the United States, executing acts of violent terrorism throughout

Central America in furtherance of their drug trafficking and money laundering operations, and putting ill-gotten profits towards efforts to maintain illegitimate power over the Venezuelan government.

13. The kidnapping, torture, and arbitrary detention of U.S. citizens is another tactic that serves and furthers Defendants' narco-terrorist scheme. Several Defendants collaborated to subject Matthew Heath and Osman Khan to years of isolation, physical and mental deprivation and abuse, and acts of terror, thereby violently controlling Matthew Heath and Osman Khan to secure them as political leverage. Indeed, Nicolás Maduro released Matthew Heath and Osman Khan only in order to secure the clemency of two narco-terrorists imprisoned in the United States for their criminal acts in furtherance of the Maduro Criminal Enterprise's narco-terrorism.

14. To this day, Matthew Heath, Osman Khan, and their families suffer from the mental, emotional, and physical effects of Heath and Khan's captivity at the hands of Defendants.

## II. PARTIES

### A. Plaintiffs

15. Plaintiff Matthew John Heath ("Matthew Heath" or "Mr. Heath") is a United States citizen, a decorated veteran of the United States Marine Corps, and a current resident of Tennessee.

16. Plaintiff I.M.H. is a United States citizen, a resident of Tennessee, and the 15-year-old minor son of Matthew Heath.

17. Plaintiff Robert John Heath ("Robert Heath") is a United States citizen, a resident of Tennessee, and the father of Matthew Heath.

18. Plaintiff Connie Demeta Haynes ("Connie Haynes") is a United States citizen, a resident of Tennessee, and the mother of Matthew Heath.

19. Plaintiff Devin Edward Waller ("Devin Waller") is a United States citizen, a resident of Tennessee, and the brother of Matthew Heath.

20.     Plaintiff McKenzie Conneal Daniels ("McKenzie Daniels") is a United States citizen, a resident of Tennessee, and the sister of Matthew Heath.

21.     Plaintiff Osman Imran Khan ("Osman Khan" or "Mr. Khan") is a United States citizen, graduate of the University of Central Florida, and current resident of Florida.

22.     Plaintiff Tania Yudith Valdes ("Tania Valdes") is a United States citizen, a resident of Florida, and the mother of Osman Khan.

23.     Plaintiff Jasmin Yudith Khan ("Jasmin Khan") is a United States citizen, a resident of Virginia, and the sister of Osman Khan.

24.     Plaintiff A.I.K. is a United States citizen, a resident of Florida, and the 16-year-old minor brother of Osman Khan.

25.     Plaintiffs Connie Haynes, Robert Heath, Devin Waller, McKenzie Daniels, I.M.H., Tania Valdes, Jasmin Khan, and A.I.K are the immediate family of Plaintiffs Matthew Heath and Osman Khan and are referred to collectively as "Family Member Plaintiffs."

**B.     Defendants**

26.     Defendant Nicolás Maduro Moros ("Nicolás Maduro" or "Maduro") is a citizen and resident of Venezuela, where he has dominated its government through illegitimate means. Maduro assumed the role of Interim President after the death of Hugo Chávez in 2013 and has since usurped the presidency of Venezuela. Maduro's rise to power (and maintenance thereof) is defined by authoritarian power grabs, human rights abuses, and flouting the rule of law. On July 31, 2017, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") added Nicolás Maduro to its list of "Specially Designated Nationals" —sanctioning his spearheading of

public corruption and efforts to undermine democracy in Venezuela.[1]   In March 2020, the Department of Justice indicted Maduro for his involvement in narco-terrorism, including his collaboration with Cartel de los Soles, Fuerzas Armadas Revolucionarias de Colombia-Ejército Del Pueblo, and other Defendants to "prioritize[] using cocaine as a weapon against America and import[] as much cocaine as possible into the United States."[2]   Maduro remains a fugitive from justice, and the United States government is offering a $15 million reward for information leading to the arrest and conviction of Maduro.[3]

27.     Defendant Fuerzas Armadas Revolucionarias de Colombia - Ejército del Pueblo ("FARC-EP") is a terrorist organization based in Colombia with many of its leaders residing in Venezuela.  FARC-EP was established by former members of the guerilla group FARC (a.k.a., Fuerzas Armadas Revolucionarias de Colombia).  Founded in 1966, FARC engaged in ransomed kidnapping, extortion, and drug trafficking to fund its campaign to overthrow the Colombian government and create a communist-agrarian state.  FARC perpetrated violence against the United States, became one of the largest producers of cocaine in the world, and was accordingly designated by the U.S. Government for its narco-terrorist conduct in October 1997,[4] October 2001,[5] and May 2003.[6]

---

[1] *See* U.S. Dep't of the Treasury, *Treasury Sanctions the President of Venezuela* (July 31, 2017), https://home.treasury.gov/news/press-releases/sm0137; U.S. Dep't of the Treasury, Office of Foreign Assets Control, *Venezuela-related Designation* (July 31, 2027), https://ofac.treasury.gov/recent-actions/20170731.

[2] Superseding Indictment ¶ 4, *United States v. Maduro Moros*, No. 1:11-CR-205 (S.D.N.Y. Mar. 26, 2020).

[3] *See* U.S. Dep't of State, Bureau of International Narcotics and Law Enforcement Affairs, *Nicolás Maduro Moros – New Target: Narcotics Rewards Program Wanted* (Mar. 26, 2020), https://www.state.gov/nicolas-maduro-moros-new-target/.

[4] *See* U.S. Dep't of State, Bureau of Counterterrorism, *Foreign Terrorist Organizations: Delisted Foreign Terrorist Organizations*, https://www.state.gov/foreign-terrorist-organizations/ (last visited Nov. 1, 2024).

[5] *See* U.S. Dep't of State, Bureau of Counterterrorism, *Executive Order 13224: Individuals Delisted by the Department of State*, https://www.state.gov/executive-order-13224/ (last visited Nov. 1, 2024).

[6] *See* U.S. Dep't of the Treasury, *Treasury Targets FARC Operative and Affiliated Companies* (Aug. 20, 2009) https://home.treasury.gov/news/press-releases/tg265.

28.     Although FARC dissolved and disarmed pursuant to a peace agreement with the Colombian government in 2016,[7] dissenting FARC members quickly established FARC-EP and took over many of FARC's cocaine productions and smuggling operations. FARC-EP has maintained FARC's alliance and partnership with Maduro and his criminal collaborators, including Cartel de los Soles. On November 30, 2021, the Department of State designated FARC-EP as a Specially Designated Global Terrorist and Foreign Terrorist Organization.[8]

29.     Defendant Cartel de los Soles ("Cartel of the Suns") is a Venezuelan drug trafficking cartel. Maduro—along with several others—controls Cartel de los Soles. Cartel de los Soles is based in Venezuela and has closely aligned and coordinated with FARC and, later, FARC-EP. Several senior members of Cartel de los Soles are or have been incarcerated in the United States, including Efraín Antonio Campo Flores ("Efraín Campo") and Francisco Flores de Freitas ("Franqui Flores"), nephews of Maduro and Cilia Flores released in the prisoner swap that included Matthew Heath and Osman Khan.

30.     Defendant Segunda Marquetalia is a terrorist organization based in Colombia with many of its leaders residing in Venezuela. Like FARC-EP, Segunda Marquetalia is a dissident faction of FARC that inherited various drug trafficking operations and has maintained an alliance with Maduro and his criminal collaborators, including Cartel de los Soles. On November 30, 2021, the State Department designated Segunda Marquetalia as a Special Designated Global Terrorist and Foreign Terrorist Organization.[9]

---

[7] *See* Anthony J. Blinken, U.S. Dep't of State, *Revocation of the Terrorist Designations of the Revolutionary Armed Forces of Colombia (FARC) and Additional Terrorist Designations* (Nov. 30, 2021), https://www.state.gov/revocation-of-the-terrorist-designations-of-the-revolutionary-armed-forces-of-colombia-farc-and-additional-terrorist-designations/.

[8] *See Id.*

[9] *See* Anthony J. Blinken, *supra* note 7.

31.     Defendant Vladimir Padrino López ("Padrino López) is a resident of Venezuela and the de facto Minister of Defense.  Since 2018, Padrino López has facilitated the military's unwavering loyalty to—and therefore, continuation of—the illicit Maduro Regime.  OFAC designated Padrino López in September 2018 for his role in helping Maduro "maintain his grip on power as his regime systematically plunders what remains of Venezuela's wealth."[10]  Padrino López is also a senior member of Cartel de los Soles and is a participant in the Maduro Regime's narco-terrorist collaborations.  In May 2019, the United States indicted Padrino López for conspiring to distribute cocaine using an airplane registered in the United States,[11] rendering him a fugitive from justice.

32.     Defendant Néstor Luis Reverol Torres ("Reverol Torres") is a resident of Venezuela where he has held many government positions.  He is currently the president of Corpozulia, a government entity focused on economic development in Zulia, Venezuela.  He was the de facto Minister of Electric Energy from about 2020-2024, the de facto Vice President of Public Services from about 2019-2024, the de facto Minister of the Interior, Justice and Peace from about 2012-2013 and returned to the position later from about 2016-2020, concurrently with positions as de facto Director of the National Anti-Drug Office ("ONA") and de facto Commander General of the National Guard of Venezuela.  On July 26, 2017, Reverol Torres was designated for undermining democracy in Venezuela by the OFAC.[12]  Reverol Torres is a senior member of Cartel de los Soles, and in August 2016, the United States Department of Justice unsealed an indictment against

---

[10] *See* U.S. Dep't of the Treasury, *Treasury Targets Venezuelan President Maduro's Inner Circle and Proceeds of Corruption in the United States* (Sept. 25, 2018), https://home.treasury.gov/news/press-releases/sm495.

[11] *See* Indictment, *United States v. Padrino Lopez*, No. 1:19-CR-00176 (D.D.C. May 7, 2019).

[12] *See* U.S. Dep't of the Treasury, *Treasury Sanctions 13 Current and Former Senior Officials of the Government of Venezuela* (July 26, 2017), https://home.treasury.gov/news/press-releases/sm0132.

Reverol Torres for his participation in international cocaine distribution.[13] The indictment alleges that, despite directing the ONA—ostensibly a government agency aimed and preventing narcotics trafficking—Reverol Torres accepted payments from drug traffickers in exchange for assisting in their distribution of cocaine for ultimate importation into the United States; interfered with ongoing narcotics investigations to allow vehicles carrying cocaine to leave Venezuela; arranged for the release of individuals arrested for narcotics violations; and organized the release of narcotics and narcotics-related currency that had been seized by law enforcement.[14]

33.     Defendant Tarek William Saab Halabi ("Tarek Saab") is a resident of Venezuela where he is the de facto Attorney General and Ombudsman. OFAC designated Tarek Saab on July 26, 2017 for undermining democracy and human rights in Venezuela.[15] Tarek Saab spoke publicly about the arrest and captivity of Plaintiff Matthew Heath and other captives on multiple occasions, including making defamatory statements about the Plaintiffs.

34.     Defendant Iván Rafael Hernández Dala ("Iván Hernández") is a resident of Venezuela, the de facto commander of Maduro's Presidential Honor Guard, and de facto leader of the Directorate General of Military Counterintelligence ("DGCIM"). The DGCIM is responsible for egregious human rights abuses and the repression of civil society in Venezuela. Under Iván Hernández's command, the DGCIM detains, interrogates, and tortures Venezuelan military members suspected of plotting against Maduro; detains and tortures family members of suspected dissenting military personnel to pressure targets and collect information; routinely frames targets

---

[13] *See* Indictment, *United States v. Reverol Torres et al.*, No. CR-15-0020 (E.D.N.Y. Jan. 21, 2015), https://www.justice.gov/doj/page/file/1261891/dl?inline; *see also* U.S. Attorney's Office, Eastern District of New York, *Former Top Leaders of Venezuela's Anti-Narcotics Agency Indicted for Trafficking Drugs to the United States* (August 1, 2016), https://www.justice.gov/usao-edny/pr/former-top-leaders-venezuela-s-anti-narcotics-agency-indicted-trafficking-drugs-united.

[14] *See* Indictment, *United States v. Reverol Torres et al.*

[15] *See Treasury Sanctions 13 Current and Former Senior Officials of the Government of Venezuela*, *supra* note 12.

by planting false evidence; and carries out acts of torture including brutal beatings, asphyxiation, cutting soles of feet with razor blades, electric shocks, and psychological torture.[16]  A U.N. Report found that DGCIM's operations "indicate coordination at a higher political level," including that "[i]n certain cases, President Nicolás Maduro and other persons of his inner circle, as well as other high-level authorities were involved in selecting [DGCIM's] targets."[17]  On February 15, 2019, OFAC designated Iván Hernández for his involvement in democratic repression, corruption, and human rights violations.[18]

35.     Defendant Diosdado Cabello Rondón ("Diosdado Cabello" or "Cabello Rondón") is a resident of Venezuela and a member of the National Assembly of Venezuela where he previously was the Speaker.   Cabello Rondón's involvement in Venezuelan politics and government dates back to the early 1990s, and he is now widely described as one of the most powerful men in Venezuela.  Cabello Rondón puts his enormous power towards exploitative ends by engaging in corruption and leading the Cartel de los Soles, as reflected in the United States indicting Cabello Rondón alongside Maduro for their narco-terrorism conspiracy.[19]  On May 18, 2018, OFAC designated Cabello Rondón for his participation in narcotics trafficking, money

---

[16] *See* United Nations, Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela* at 8-9 (Sept. 20, 2022), available at https://www.ohchr.org/en/hr-bodies/hrc/ffmv/report-ffmv-september2022#:~:text=20%20September%202022-,English,-(Advance%20Unedited%20Version.

[17] *Id.* at 8.

[18] *See* U.S. Dep't of the Treasury, *Treasury Sanctions Officials Aligned with Former President Nicolas Maduro and Involved in Repression and Corruption* (Feb. 15, 2019), https://home.treasury.gov/news/press-releases/sm612.

[19] *See* Superseding Indictment at ¶¶ 6, 8, 14(d)-(e), 15(d), 15(f)-(j), 15(l)-(m), 15(o), 15(r), *supra* note 2.

laundering, embezzlement of state funds, and other corrupt activities.[20]  The Department of State is offering $10 million for information leading to Cabello Rondón's arrest and/or conviction.[21]

36.     Defendant Alex Nain Saab Morán ("Alex Saab") is a resident of Venezuela and a trusted, long-time financier of the Maduro Criminal Enterprise.  In 2019, the United States (1) designated Alex Saab[22] and (2) indicted him in the United States District Court for the Southern District of Florida for conspiracy to commit money laundering in connection with a scheme involving $350 million in wire transfers.[23]  As a part of OFAC's sanctions of Alex Saab, his associates, and a variety of shell companies used to facilitate their global criminal conspiracy, the United States blocked the property of a shell company owned and/or controlled by Alex Saab, namely, a luxury apartment in Miami, Florida.  His importance to the Maduro Regime is evident. Within hours of Alex Saab's extradition to Miami in October 2021, Maduro stated he would cease negotiations with the political opposition (supported by the United States), and Venezuelan authorities rounded up six U.S. citizens under house arrest in Venezuela.[24]  And in December 2023, Maduro agreed to extradite a fugitive from justice and release ten American detainees and twenty-

---

[20] *See* U.S. Dep't of the Treasury, *Treasury Targets Influential Former Venezuelan Official and His Corruption Network* (May 18, 2018), https://home.treasury.gov/news/press-releases/sm0389.

[21] *See* U.D. Dep't of State, *Diosdado Cabello Rondón – New Target: Narcotics Rewards Program, Wanted* (Mar. 26, 2020), https://www.state.gov/diosdado-cabello-rondon-new-target/.

[22] *See* U.S. Dep't of the Treasury, *Treasury Disrupts Corruption Network Stealing from Venezuela's Food Distribution Program, CLAP* (July 25, 2019), https://home.treasury.gov/news/press-releases/sm741.

[23] *See* U.S. Attorney's Office, Southern District of Florida, *Colombian Businessman Charged with Money Laundering Extradited to the United States from Cabo Verde* (Oct. 18, 2021), https://www.justice.gov/usao-sdfl/pr/colombian-businessman-charged-money-laundering-extradited-united-states-cabo-verde.

[24] *See* Rachel Pannett, *Venezuela Suspends Talks with Opposition After Maduro Ally Extradited to the United States*, Wash. Post (Oct. 17, 2021), https://www.washingtonpost.com/world/2021/10/17/venezuela-saab-extradition-citgo-opposition-talks/.

one Venezuelan prisoners in exchange for Alex Saab's release and clemency.[25]  Most recently, Maduro appointed Saab to lead Venezuela's international investment center.

37.     Defendant José Miguel Domínguez Ramírez ("Domínguez Ramírez"), alias "Miguelito," is a resident of Venezuela and was the de facto Director of the Venezuelan National Police's Special Actions Force (a.k.a. "FAES") from about April 2019 until its formal dissolution in June 2022.  Under Domínguez Ramírez's leadership, FAES was the most lethal security force in Venezuela, routinely conducting extrajudicial killings as a part of Venezuela's policy of social control.[26]  OFAC designated Domínguez Ramírez in March 2019 for his role directing FAES' human rights violations facilitating repression in Venezuela.[27]

38.     Defendant Cilia Adela Flores de Maduro ("Cilia Flores") is a resident of Venezuela and is married to Maduro.  She has been involved in Venezuelan politics since the 1990s and is currently deputy of the National Assembly of Venezuela in addition to being the First Lady.  Cilia Flores "brandishes the power of her husband's office, demanding important briefings even before the president," wields significant influence over Venezuelan politics and governance, and engages in corruption.[28]  OFAC designated Cilia Flores in September 2018[29] for her corrupt activities and role in undermining Venezuelan democracy.  Notably, in 2015, Cilia Flores helped her nephews

[25] *See* Deepa Shivaram, *U.S. Strikes Prisoner Swap Deal with Venezuela, Plus Extradition of 'Fat Leonard'*, NPR (Dec. 20, 2023), https://www.npr.org/2023/12/20/1220615028/biden-venezuela-fat-leonard.

[26] *See* United Nations, Human Rights Council, *The Directorate of Strategic and Tactical Actions of the Bolivarian National Police Corps and its relationship with the former Special Action Forces* at 8-9 (Sept. 18, 2023), https://www.ohchr.org/sites/default/files/documents/hrbodies/hrcouncil/sessions-regular/session54/advance-versions/A_HRC_54_CRP9_CleanEnglishVersion.pdf.

[27] *See* U.S. Dep't of the Treasury, *Treasury Sanctions Security Officials Associated with Violence and Obstruction of Humanitarian Aid Delivery* (Mar. 1, 2019), https://home.treasury.gov/news/press-releases/sm615.

[28] Angus Berwick & Matt Spetalnick, *U.S. Takes Aim at The Power Behind Venezuela's Maduro: His First Lady* (May 27, 2020), https://www.reuters.com/investigates/special-report/venezuela-politics-flores/.

[29] *See Treasury Targets Venezuelan President Maduro's Inner Circle and Proceeds of Corruption in the United States*, *supra* note 10.

(Efraín Campo and Franqui Flores) plan the shipment of $20 million worth of cocaine into the United States to help finance her National Assembly reelection campaign.[30] But, before the plan came to pass, the DEA arrested the nephews and a jury convicted them for the drug trafficking conspiracy in the United States District Court for the Southern District of New York.[31] As explained in the Government's sentencing memo for Efraín Campo and Franqui Flores, the objective of using drug proceeds was "to prolong their family's control of Venezuela by funding at least one political campaign for Cilia Flores."[32] "This conduct permits large-scale drug trafficking to flourish throughout the Americas" and leads to violence.[33] Efraín Campo and Franqui Flores were incarcerated in the United States until October 1, 2022, when, in exchange for the nephews' release and clemency, Maduro released seven wrongfully detained U.S. citizens including Plaintiffs Matthew Heath and Osman Khan.

39.     Defendant Reynaldo Hernández is a resident of Venezuela and an agent of the DGCIM.  Reynaldo Hernández tortured and abused Matthew Heath and Osman Khan during their detention.

40.     Defendant Marlon Salas Rivas ("Salas Rivas") is currently a Lieutenant Colonel in the DGCIM.  Salas Rivas tortured and abused Matthew Heath and Osman Khan during their detention.

41.     Defendant Alexander Enrique Granko Arteaga ("Granko Arteaga") is a Lieutenant Colonel in the Bolivarian National Guard and serves as the Chief of Special Affairs Unit of the

---

[30] *See Id.*

[31] *See* The Government's Sentencing Memorandum as to Defendants Efrain Antonio Campo Flores and Franqui Francisco Flores de Freitas at 55, *United States v. Campo Flores et al.*, No. 1:15-CR-00765, ECF 180 (S.D.N.Y. Sept. 11, 2017).

[32] *Id.* at 69.

[33] *Id.*

DGCIM. Granko Arteaga has ordered, supervised, and directly participated in arbitrary detentions, enforced disappearances, torture, and other cruel, inhumane or degrading treatment of detainees in DGCIM facilities. He was placed on the U.S. Department of Treasury's Office of Foreign Assets Control Specially Designated Nationals list on July 19, 2019.[34]

42. Petróleos de Venezuela, S.A. (a.k.a. "PDVSA") is Venezuela's state-run oil company that the Maduro Criminal Enterprise leverages to launder money for the narco-terrorism conspiracy for circulation in the legitimate U.S. economy. On January 28, 2019, the OFAC designated PDVSA.[35] The money laundering activities of PDVSA are essential to the Defendants' narco-terrorist conspiracy including its drug trafficking operations. PDVSA is the parent company of Citgo.

43. Compañía General de Minería de Venezuela, (a.k.a. CVG Compañía General de Minería de Venezuela CA, a.k.a. Corporación Venezolana de Guyana Minerven C.A., a.k.a. CVG Minerven, a.k.a. and hereinafter "Minerven") is Venezuela's state-owned gold company. Minerven is designated as a Specially Designated National subject to sanctions under OFAC as of the filing of this complaint.[36] The Maduro Administration's gold laundering scheme was facilitated through Minerven, which melts illicitly mined gold, regulated by criminal groups, including FARC-EP and the Colombian guerilla insurgency group, the National Liberation Army, as well as Venezuelan armed forces.[37] The profit generated from Minerven and the Maduro Regime's gold scheme has

---

[34] *See* Press release, U.S. Dep't of the Treasury, *Treasury Sanctions Officials of Venezuela's Military Counterintelligence Agency* (July 19, 2019), available at https://home.treasury.gov/news/press-releases/sm738.

[35] *See* U.S. Dep't of the Treasury*, Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A.*, (Jan. 28, 2019), https://home.treasury.gov/news/press-releases/sm594.

[36] *See Id.*

[37] *See* Ryan C. Berg & Karla Rios, *Authoritarian Survival: Venezuelan Gold and Nicaragua's Ortega-Murillo Regime*, CSIS (March 8, 2022), https://www.csis.org/analysis/authoritarian-survival-venezuelan-gold-and-nicaraguas-ortega-murillo-regime.

become increasingly important to the financial support of Maduro's reign, particularly considering international crackdowns on both oil and the illicit drug trade.

## III.   JURISDICTION AND VENUE

44.   This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' Counts One, Two, and Seven arise under the law of the United States: the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, note, and Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1962(a).

45.   Pursuant to 18 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' state-law claims (Counts Three through Six and Eight) because those claims arise from the same nucleus of operative facts as the ATA, TVPA, and RICO claims and are part of the same case or controversy under Article III of the United States Constitution. Plaintiffs are unable to bring any of their claims in Venezuela.[38]

46.   This Court further has subject-matter jurisdiction pursuant to 28 U.S.C § 1332(a)(2) because the Plaintiffs are citizens of Tennessee, Florida, and Virginia, and Defendants are citizens or subjects of Venezuela.

47.   Defendants are subject to personal jurisdiction pursuant to Florida's long arm statute, Fla. Stat. § 48.193 (2024).  Defendants personally and/or through their agents committed tortious acts in the State of Florida, giving rise to Plaintiffs' claims.  Defendants:

> i.   provided material support to terrorists in violation of 18 U.S.C. § 2339B and 18 U.S.C. § 2339C by trafficking cocaine and illegal gold into Florida and

---

[38] *See* On March 11, 2019, the United States Department of State withdrew diplomatic personnel from the U.S. Embassy in Caracas, Venezuela, and consular services are suspended.  In light of crime and human rights abused against U.S. citizens, the U.S. Department of State's level four "Do Not Travel" advisory also remains in place for U.S. citizens.   *See* U.S. Dep't of State, Bureau of Consular Affairs, *Venezuela Travel Advisory*, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/venezuela-travel-advisory.html (Sept. 24, 2024).  As such, any exhaustion-of-remedies requirements would be futile.

laundering the ill-gotten profits of such trafficking throughout Florida, intending that the proceeds of such actions would be put towards acts of terror, including the tortious kidnapping and torture of Matthew Heath and Osman Khan;

ii.  provided material support to terrorists in violation of 18 U.S.C. § 23339B and 18 U.S.C. § 2339C by engaging in the illicit scheme of moving gold from illegal gold mining operations through Defendants Minerven and Madura and their agents into Florida, and specifically, Miami, for illegal sale;

iii.  unlawfully kidnapped and tortured U.S. citizens as an essential component of their ongoing narcotics trafficking throughout Southern Florida, for example, by leveraging Matthew Heath and Osman Khan to secure the release of key participants in their criminal enterprise—in this case, Efraín Campo and Franqui Flores;

iv.  extorted the mother of Osman Khan—Florida resident Tania Yudith Valdes—in Florida for payments Defendants claimed would lead to the release of Osman, and Florida resident Tania Yudith Valdes made ransom payments from Florida to Defendants and/or their agents;

v.  made false statements relating to the arrest and captivity of Osman Khan and Matthew Heath, including engaging in defamation *per se*, that were subsequently printed and distributed in Florida-based media;

vi.  caused or employed agents who committed acts of international terrorism through the kidnapping and torture of Florida resident, Osman Khan and

causing the extreme emotional distress of Florida residents Tania Valdes, Jasmin Khan, and A.I.K;

vii.    caused pecuniary harm to Matthew Heath in the state of Florida through the loss of his 47-foot cutter-rigged sailboat, *Cinnabar*, routinely docked in Miami, and docked in Key West at the time of Mr. Heath's kidnapping and torture, which was repossessed by the USAA Insurance Agency in Key West as Mr. Heath was unable to make payments while being held and tortured by Defendants; and

viii.    are currently being sued in pending actions in the Southern District of Florida Miami Division based on substantially similar facts and circumstances of alleged material support to terrorists in violation of the ATA, 18 U.S.C. § 2333.

48.    In the alternative, Defendants are subject to personal jurisdiction pursuant to Fed. R. Civ. P. 4(k)(2) because the Plaintiffs assert claims arising under federal law, the Defendants are not subject to jurisdiction in any state's courts of general jurisdiction, and exercising jurisdiction is consistent with the United States Constitution. Defendants' actions in the United States, taken directly and/or through agents, gave rise to Plaintiffs claims. These actions include:

i.    criminally trafficking hundreds of millions, if not billions, of dollars' worth of narcotics into the United States for distribution, laundering the proceeds of that trafficking in the United States, and intending that the profits of these illicit activities be used for acts of terror including the kidnapping and torture of Heath and Khan;

ii.     targeting, wrongfully detaining, and torturing U.S. citizens—including Mr. Heath and Mr. Khan—to use as leverage in negotiating the release of collaborators in the narcotics trafficking enterprise;

iii.    upon information and belief, taking possession of and selling Matthew Heath's Tennessee-registered boat—the "Purple Dream"—during Matthew's wrongful detention by presenting falsified Tennessee Department of Revenue documents to the purchaser and to authorities at Oranjestad Harbor; and

iv.    continuously extorting Connie Haynes, Robert Heath and Tania Yudith Valdes (who at all relevant times resided in the United States) during Mr. Heath's and Mr. Khan's wrongful detention.

49.    Venue is proper in this forum pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, including, but not limited to: (1) the procurement of funds and provision of material support to terrorists and other acts facilitating the Maduro narco-terrorist conspiracy in violation of the ATA; (2) flooding this district with cocaine through the Defendants' criminal enterprise; (3) laundering ill-gotten proceeds of narcotics, illegal gold trafficking, and Maduro's government corruption through this district; and (4) accepting bribes from accounts maintained in this district.  Money laundering and drug trafficking in this district positioned Defendants to fund the kidnapping and torture of Matthew Heath and Osman Khan.

50.    Venue is alternatively proper in this forum pursuant to 28 U.S.C § 1391(b)(3) and (c)(3) because the foreign Defendants are subject to this Court's personal jurisdiction.

## IV. FACTUAL ALLEGATIONS

### A. The Maduro Criminal Enterprise

51.     The Maduro Criminal Enterprise includes Nicolás Maduro, loyalists serving in his regime (including the Individual Defendants), Cartel de los Soles, FARC (later, FARC-EP), as well as the state-run oil corporation PDVSA and state-run gold mining corporation Minerven.  Members of the Maduro Criminal Enterprise together conspired and agreed to: commit narcotics trafficking and related terrorism against the United States (a.k.a. "narco-terrorism"); illegally profit from the sale of gold in the United States in violation of sanctions imposed upon Maduro's regime and Minerven specifically; launder money in the United States; and torture, detain, and murder United States citizens.  The Maduro Criminal Enterprise undertakes acts of terror against American citizens with the intent to extort or influence the United States Government to bend to their demands—foremost of which includes high-level prisoner swaps.

52.     For at least 20 years, the Maduro Criminal Enterprise's narco-terrorism conspiracy enriched itself by importing cocaine into the United States and other countries.  The Maduro Criminal Enterprise operates both with the goal of maintaining Maduro's authoritarian political control in Venezuela and because of Maduro's authoritarian control.  In other words, the Maduro Criminal Enterprise can perpetrate profitable crimes because of Maduro's power, and the profits then go towards actions to facilitate the continuation of Maduro's power—e.g., buying the loyalty of military and security forces that can suppress political opposition, otherwise bribing critical political leaders, and funding political campaigns.

53.     Further, the Maduro Criminal Enterprise deploys illicit drugs into the United States as a form of warfare.  Importing cocaine into the United States causes tremendous harm in communities, including addiction and drug-related crimes.  The Department of Justice indictment

against Maduro and other Venezuelan leaders for narco-terrorism was largely premised on the devastation the drug trade posed to U.S. citizens.

54.     The Maduro Criminal Enterprise additionally funds its illegal schemes, flaunts United States sanctions laws, and further supports the terroristic rule of Nicolás Maduro through sales of "blood gold" in the United States, particularly in Miami, Florida.  In addition, the Maduro Criminal Enterprise uses the smuggling and sale of illegal gold as a way to partner with Colombian drug traffickers who launder cocaine profits by trading Venezuelan gold.

55.     Nicolás Maduro leads the Maduro Criminal Enterprise as the illegitimate President of Venezuela.  Maduro clings to power by unabashedly pursuing authoritarianism in order to leverage his position in support of Defendants directly engaged in narco-terrorist conduct.  Various officials in the Maduro Criminal Enterprise execute illegal activities in furtherance of the narco-terrorist conspiracy at his behest, including the wrongful capture and detention of U.S. citizens which he uses as political pawns.

56.     FARC/FARC-EP, Cartel de los Soles, and Segunda Marquetalia each engage in violent acts of terrorism in order to traffic cocaine destined for U.S. shores, including Florida. Each entity cooperates with other Defendants, taking direction from Maduro, Padrino López, Cabello Rondón, and Reverol Torres, in exchange for immunity from prosecution by the Venezuelan government.

57.     Padrino López, as de facto Minister of Defense, permitted drug traffickers to route narcotics through Venezuela in route to the United States.  "Padrino López allegedly accepted

bribes from drug trafficking organizations," in return, ensuring the military would not intercept aircraft trafficking drugs through Venezuelan air space.[39]

58.     Néstor Luis Reverol Torres, as former de facto General Director of the ONA (Venezuela's Drug Enforcement Administration equivalent), former de facto commander of Venezuela's National Guard, former de facto Minister of the Popular Power for Interior, Justice and Peace of Venezuela, former de facto Minister of Electric Power, and the current de facto President of "Corpozulia," a Venezuelan Government organization focusing on cultural development in Zulia, Venezuela, supports the Maduro Criminal Enterprise.  On July 26, 2017, OFAC imposed sanctions on Reverol Torres for "undermining democracy" in Venezuela.  In 2016, the U.S. Department of Justice unsealed an indictment against Reverol Torres for his participation in an international cocaine distribution conspiracy.[40]  Despite being the head of Venezuela's ant-narcotics agency, Reverol Torres "received payments from drug traffickers in exchange for assisting in the distribution of cocaine for ultimate importation into the United States [and] interfered with ongoing narcotics investigations to allow vehicles carrying cocaine to leave Venezuela."[41]  Reverol Torres is a senior member of Defendant Cartel of the Sun and is a fugitive from justice.

59.     Tarek Saab, as de facto Attorney General or "Chief Prosecutor" of Maduro's illegitimate regime supported the criminal enterprise through various illicit means.  Tarek Saab

---

[39] Dep't of Justice, *Assistant Attorney General Brian A. Benczkowski Delivers Remarks at Press Conference Announcing Criminal Charges Against Venezuelan Officials* (March 26, 2020), https://www.justice.gov/opa/speech/assistant-attorney-general-brian-benczkowski-delivers-remarks-press-conference-announcing.

[40] Press Release, U.S. Dep't of Treasury, *Treasury Sanctions 13 Current and Former Senior Officials of the Government of Venezuela*, *supra* note 12.

[41] Press Release, U.S. Immigration and Customs Enforcement, *Former top leaders of Venezuela's anti-narcotics agency indicted for trafficking drugs to the US*, (Aug. 2, 2016) available at https://www.ice.gov/news/releases/former-top-leaders-venezuelas-anti-narcotics-agency-indicted-trafficking-drugs-us.

gained this position in 2017 through the illegitimate overthrow of the 2015-elected parliament. Tarek Saab's reputation in Venezuela and globally is fearsome, and his role in the Maduro Criminal Enterprise has grown to include serving as the primary public-facing defender of Maduro and chief of spin and propaganda. On July 26, 2017, OFAC sanctioned him for undermining democracy in Venezuela.[42] As the mouthpiece for the Maduro Criminal Enterprise, Tarek Saab made multiple defamatory statements about Matthew Heath and Osman Khan. Tarek Saab is invaluable to the Maduro Criminal Enterprise as he wields his power to launch criminal investigations and assert false charges against individuals opposed to Maduro or those that may fetch a political price benefiting the Maduro Criminal Enterprise.

60.     Defendant Iván Rafael Hernández Dala is the Commander of Venezuela's DGCIM. In 2019, the United States publicly sanctioned Hernández Dala for "gross violations of human rights." Hernández Dala "ha[s] been implicated for [] human rights violations and abuses and the repression of civil society and the democratic opposition. These acts were documented extensively in the July 5, 2019 report by the United Nations High Commissioner for Human Rights, [which] noted at least 7,523 extrajudicial killings documented by a Venezuelan non-governmental organization." As leader of the DGCIM, Hernández Dala bears direct responsibility for the captivity and torture of Matthew Heath and Osman Khan, as well as the anguish and extortion experienced by the Family Member Plaintiffs. The Maduro Criminal Enterprise deputizes DGCIM to silence detractors, strike fear into the hearts of the Venezuelan people, and provide valuable hostages to extort money and political concessions from other nations, including the United States.

---

[42] *See* Press Release, U.S. Dep't of Treasury, *Treasury Sanctions 13 Current and Former Senior Officials of the Government of Venezuela, supra* note 12.

61.     Diosdado Cabello Rondón is one of the leaders of Cartel of the Suns and a senior member of Maduro's regime, having served as a former member of the National Assembly of Venezuela, and currently as de facto Minister of Interior, Justice and Peace.  He is also an active member of the Venezuelan armed forces, with the rank of captain.  Cabello Rondón was sanctioned by OFAC in 2018, when the Treasury Department described him as "engag[ing] in narcotics trafficking, money laundering, embezzlement of state funds, and other corrupt activities" to the detriment of the Venezuelan people.[43]

62.     Alex Nain Saab Morán has served as a vital part of the Maduro Criminal Enterprise as Maduro's chief financier.  He was indicted in the Southern District of Florida for conspiracy to commit money laundering in connection with a scheme involving $350 million in wire transfers. Alex Saab has been described as "instrumental in negotiating deals with other countries in the face of choking sanctions" on Maduro's behalf.[44] Defendant Saab was arrested in Cape Verde in June 2020 having been indicted in Miami on charges of money laundering and execution of a bribery scheme benefiting the Maduro Criminal Enterprise.  In December 2023, Maduro released ten Americans detained in Venezuela and promised to release twenty opposition-linked Venezuelan prisoners in exchange for Alex Saab's clemency and release.[45]

63.     José Miguel Domínguez Ramírez is the former Chief Commissioner of the Special Action Forces ("FAES") in Tachira and was sanctioned in 2019 as a "security official[] of the illegitimate Maduro Criminal Enterprise associated with obstruction of the entry of international

---

[43] Press Release, U.S. Department of the Treasury, *Treasury Targets Influential Former Venezuelan Official and His Corruption Network* (May 18, 2018) available at https://home.treasury.gov/news/press-releases/sm0389.

[44] *Maduro Regime to Shield Alex Saab from Extradition,* Robert Lansing Institute, (June 23, 2021), https://lansinginstitute.org/2021/06/23/maduro-regime-to-shield-alex-saab-from-extradition/.

[45] *See* Marianna Parraga, Mayela Armas, and Trevor Hunnicutt, *Americans freed by Venezuela in US prisoner swap land at Texas base*, Reuters (Dec. 21, 2023), https://www.reuters.com/world/us/us-has-freed-close-ally-venezuela-president-swap-jailed-americans-ap-2023-12-20/.

humanitarian aid into Venezuela or violence against those who attempted to deliver this assistance."[46] Domínguez Ramirez is currently Director of the Directorate of Strategic and Tactical Actions ("DAET") since July 2022 and Assistant Director of the Bolivarian National Police ("PNB") since July 2023. The FAES is one of two Venezuelan security forces that are reportedly responsible for nearly two-thirds of all extrajudicial killings in Venezuela.[47]

64.     Cilia Flores is the spouse of Maduro and the illegitimate "first lady" of Venezuela. She is "widely considered the power behind President Nicolás Maduro's throne."[48] Cilia Flores was placed on the OFAC sanctions list in 2018. Cilia Flores's nephews— Efraín Campo and Franqui Flores —were convicted and sentenced to 216 months in prison and a $50,000 fine each for conspiracy to import over 800 kilograms of cocaine into the United States. Evidence from that investigation shows that Cilia Flores' nephews were acting on her behalf and to her benefit, intending to use portions of the proceeds of their drug trafficking scheme to fund Cilia Flores' campaign for a position in the Venezuelan National Assembly. Further, "[e]lectronic communications seized from the defendants' phones also demonstrated, among other things, that Efraín Campo and Franqui Flores had engaged in a scheme to solicit bribes from debtors of Venezuela's state-run oil and natural gas company, [PDVSA], in exchange for promises that a cousin, Carlos Erik Malpica-Flores, would cause PDVSA to approve and make payments on

---

[46] *See* Press Release, The U.S. State Dept., *The United States Sanctions Illegitimate Maduro Regime Security Officials Associated with Violence and Obstruction of International Humanitarian Assistance* (March 1, 2019), https://2017-2021.state.gov/the-united-states-sanctions-illegitimate-maduro-regime-security-officials-associated-with-violence-and-obstruction-of-international-humanitarian-assistance/.

[47] Robert Lansing Institute *Government and paramilitary groups behind human rights violation in Venezuela* (Sep. 21, 2020), https://lansinginstitute.org/2020/09/21/government-and-paramilitary-groups-behind-human-rights-violation-in-venezuela/.

[48] Angus Berwick & Matt Spetalnick, *U.S. takes aim at the power behind Venezuela's Maduro: his first lady*, Reuters (May 27, 2020), https://www.reuters.com/investigates/special-report/venezuela-politics-flores/.

certain debts."[49] Those nephews were granted clemency and released in the prisoner swap that included the release of Matthew Heath and Osman Khan. Defendant Flores is a resident of Venezuela.

65. Defendants Reynaldo Hernández, Salas Rivas, and Granko Arteaga are (or were) DGCIM agents who serve the Maduro Criminal Enterprise by securing collateral (*i.e.* U.S. Citizens) for Maduro to leverage in prisoner swaps and free participants in the narco-terrorist conspiracy prosecuted in the U.S. for their crimes. Reynaldo Hernández, Salas Rivas, and Granko Arteaga execute Maduro's and Domínguez Ramírez's policy of torturing wrongfully detained U.S. citizens to increase pressure on the U.S. government to grant clemency to convicted narco-terrorists so that suffering U.S. citizens may return home.

66. Beginning in at least 2013, PDVSA became "a massive industrial money launderer at the service of narcotrafficking,"[50] functioning to conceal the illicit origins of the Maduro Criminal Enterprise's profits. It is also a vehicle for corruption insofar as Maduro and other Venezuelan officials embezzle its funds. On January 28, 2019, the Treasury Department designated PDVSA to "prevent further diverting of Venezuela's assets by Maduro" and help "preserve these assets for the people of Venezuela."[51]

67. The Maduro Criminal Enterprise has developed a "highly sophisticated scheme for sanctions evasion through the use of illicitly mined gold."[52] In the face of significant sanctions

---

[49] Press Release, United States Drug Enforcement Administration, *Nephews of Venezuela First Lady Each Sentenced to 18 Years in Prison for Conspiring to Import Cocaine into The United States* (Dec. 15, 2017), https://www.dea.gov/press-releases/2017/12/15/nephews-venezuela-first-lady-each-sentenced-18-years-prison-conspiring.

[50] Ricardo Guanipa D'erizans, *PDVSA, a Major Money Laundering Operation*, Diálogo Americas (Aug. 3, 2019), https://dialogo-americas.com/articles/pdvsa-a-major-money-laundering-operation/.

[51] U.S. Department of Treasury, *Treasury Sanctions Venezuela's State Owned Oil Company Petroleos de Venezuela, S.A.* (Jan. 28, 2019), https://home.treasury.gov/news/press-releases/sm594.

[52] Ryan C. Berg & Karla Rios, *supra* note 37.

and increased crackdowns on the illegal drug trade, the importance of gold to Maduro's continued power has grown.

68.     The importance of the illegal gold criminal enterprise cannot be overstated because, as the Miami Herald reports, "[a]s Venezuela collapses into an economic depression like few seen in the last century, the isolated government of Nicolás Maduro still has one cash cow left: Gold."[53]

## B.     The Rise of the Maduro Criminal Enterprise

69.     Founded in or around 1999, FARC was a prominent guerrilla group in the Western Hemisphere, intent on overthrowing the Colombian national government and creating a communist-agrarian state.  FARC was among the world's largest producers of cocaine, funding its political and military campaign against the Colombian government through ransomed kidnapping, extortion, and drug trafficking.  FARC similarly contributed to overseeing and controlling the illicit gold mining operations under Maduro's regime.  Furthermore, FARC perpetrated acts of violence against the United States, its nationals, and property.

70.     Cartel de los Soles, or "Cartel of the Suns," is a Venezuelan drug-trafficking organization operating since about 1999.  Cartel de los Soles has waged a terrorist war on the Venezuelan people and usurped and corrupted legitimate Venezuelan government institutions— including the legislature, the courts, and the military—to further the importation of cocaine into the United States.  The name "Cartel of the Suns" is a reference to the sun insignia fastened to the uniforms of the high-ranking Venezuelan military officials that are also members of and collaborators with the cartel.

---

[53] *See* Antonio Maria Delgado et al., *How Miami, a Major Destination for Venezuelan Gold, is Helping Prop Up Maduro's Regime*, Miami Herald (Aug. 05, 2019), https://www.miamiherald.com/news/nation-world/world/americas/venezuela/article230669164.html.

71.     By the year 2000, FARC agreed with leaders of Cartel de los Soles to relocate some of its operations to Venezuela under the protection of the Cartel.

72.     Nicolás Maduro was a manager and leader of Cartel de los Soles as he rose to power in Venezuela.  Under the leadership of Maduro, as well as other Venezuelan officials including Padrino López, Reverol Torres, Cabello Rondón, and other Maduro loyalists, Cartel de los Soles sought to enrich itself and its members by flooding the United States with cocaine in collaboration with FARC.

73.     Specifically, the Maduro Criminal Enterprise conspired to secure shipments of FARC-produced cocaine into the United States; ensure the acquisition of weapons to FARC to support its terrorist operations; coordinate with foreign governments, including Honduras, to facilitate large-scale drug trafficking to support its terrorist operations; create and obtain training for an armed forces unit dedicated to protecting Cartel de los Soles; engage in money laundering both within and without the United States; and engage in a campaign of kidnapping, taking hostage, detaining, torturing, and murdering U.S. citizens.

74.     FARC and Cartel de los Soles moved the cocaine they processed in Venezuela to the United States via transshipment points in the Caribbean and Central America, including Honduras and Guatemala.  The United States government estimates that by the mid-2000s, 250+ tons of cocaine exited Venezuela each year on its way to the United States and other profitable markets.[54]

---

[54] *See* U. S. Gov't Accountability Off.,  GAO-08-751, Drug Control, *U.S. Counternarcotics Cooperation with Venezuela Has Declined* (July 2009), https://www.gao.gov/assets/gao-09-806.pdf ("In 2008, ONDCP reported that the estimated flow of cocaine transiting Venezuela toward the United States, West Africa, and Europe increased more than fourfold from about 60 metric tons in 2004 to about 260 metric tons in 2007.").

75.     To achieve safe passage between Venezuela and Honduras, FARC and Cartel de los Soles paid bribes in exchange for access to commercial ports and radar data necessary to protect the air bridge cocaine route.

76.     In or around 2005, at the direction of then-Dictator President Hugo Chávez, Maduro (then a member of the Venezuelan National Assembly) and his criminal collaborators worked to pack the court with supporters of Chávez and his followers, intimidate and coerce judges into making decisions in line with the motives of the Chávez regime, and remove Venezuelan judges who refused to protect FARC and its narco-terrorism operations being conducted within Venezuela with the assistance of Cartel de los Soles. That same year, the Venezuelan government largely terminated Venezuela's participation in bilateral counter-narcotics operations with the Drug Enforcement Administration.

77.     In or about 2006, Chávez appointed Maduro as foreign minister of Venezuela. Shortly thereafter, FARC paid Maduro $5 million in drug proceeds to launder FARC's ill-gotten money through a trade agreement with Malaysia.

78.     In or about 2008, Chávez was serving both as the leader of Venezuela and as one of the leaders of Cartel de los Soles and used funds from the Venezuela state-owned oil producer, PDVSA, to support FARC's narco-terrorist operations. This relationship set the steppingstones for Maduro to continue, heighten, and intensify the scheme between government officials, state-run corporations, and the cartel and terrorist groups. In or about 2008, Maduro, his criminal collaborators, including FARC, Cartel de los Soles, and certain of the Individual Defendants named herein, met and came to an agreement that Cartel de los Soles would provide FARC with cash and weapons in exchange for increased cocaine production. At the meeting, Maduro promised to use

his authority as foreign minister to ensure that the border between Venezuela and Colombia remained open to facilitate cocaine trafficking.

79. In or about 2009, Maduro attended a FARC meeting about a shipment of cocaine FARC intended to transport to Cartel de los Soles. During that meeting, the group also discussed political instability in Honduras (due to a recent coup d'etat), and the threat it posed to their narcotics trafficking. Thereafter, Maduro traveled to Honduras in his capacity as Venezuela's foreign minister to ensure the political change would not interrupt the narcotics trafficking operations.

80. Upon the death of Hugo Chávez on March 5, 2013, Maduro became acting President. On or about April 14, 2013, Maduro narrowly won the presidential election and used forces to violently suppress protestors who disputed the legitimacy of the election.

81. After Maduro succeeded to the Venezuelan presidency, Cartel de los Soles flew 1.3 tons of cocaine from Maiquetía Airport to Paris where it was seized by French police. Following the seizure, Defendant Maduro canceled a trip to New York to attend a meeting of the United Nations General Assembly, claiming he was cancelling his appearance because of death threats he had received. Since Maduro's control over the Maiquetía Airport was a well-known fact, Maduro encouraged Cartel de los Soles to use other well-established drug routes to dispatch their cocaine to further conceal the Maduro Criminal Enterprise's involvement.

82. Shortly after the French police seized the cocaine shipment originating from Venezuela, Maduro directed the arrest of several military officials to divert public and law enforcement scrutiny from the involvement of members of the Maduro Criminal Enterprise in the seized shipment.

83.     In or around 2014, Maduro met with a FARC representative at a military base in Venezuela and offered to continue providing weaponry to FARC in exchange for their assistance in training an armed militia group.  In or about 2015, members of Cartel de los Soles diverted Venezuelan military equipment to FARC in accordance with the agreement.  Defendant Cabello Rondón as a representative of the Maduro Criminal Enterprise participated in the delivery of machine guns, ammunition, and rocket launchers to FARC at a military base in Venezuela.  In accordance with the Maduro Criminal Enterprise's plan, during the delivery, Defendant Cabello Rondón discussed with FARC members present the fact that the weapons were a partial payment for cocaine that FARC provided to members of Cartel de los Soles.

84.     FARC collaborated with other individuals in the Maduro Criminal Enterprise, including Cilia Flores and people working at her behest.  In August 2015, Franqui Flores and Efraín Campo, nephews of Cilia Flores and Maduro, conspired with participants in the Maduro Criminal Enterprise to dispatch 800 kilograms of cocaine via private aircraft from Simón Bolívar International Airport in Maiquetía, Venezuela, premises under Maduro's control.

85.     Throughout October and November 2015, Franqui Flores and Efraín Campo participated in meetings in Venezuela regarding the shipment of cocaine through Honduras to its destination: the United States.  During secretly recorded conversations with undercover DEA agents, Franqui Flores and Efraín Campo told the agents that they were at "war" with the United States, described Cartel de los Soles and its connection to FARC, and admitted that they were seeking to raise $20 million in drug proceeds to support Cilia Flores's Venezuelan National Assembly campaign.

86.     Efraín Campo met with an unidentified FARC collaborator, "El Gocho," approximately five times to discuss the plan to transport FARC-supplied cocaine from Simón

Bolívar International Airport (controlled by Maduro) to Juan Manuel Gálvez International Airport in Roatán, Honduras. Following one meeting, Campo Flores sent messages to a Drug Enforcement Administration confidential informant that stated, "What I want is to start work because the electoral campaign is almost here and I always contribute . . . [w]ith money if you know what I mean that is why I want to start work."[55]

87.     On November 4, 2015, Franqui Flores and Efraín Campo were indicted in the Southern District of New York on charges of conspiring to import five or more kilograms of cocaine into the United States from a foreign country and distributing five or more kilograms of cocaine while knowing and intending it to be imported into the United States in violation of 21 U.S.C.§§ 952(a) and 960(a)(1).

88.     On November 10, 2015, Franqui Flores and Efraín Campo flew to Haiti on a private jet to pick up the multimillion-dollar payment for the cocaine. "During a recorded meeting, CAMPO FLORES described the defendants' connection to a 'supposedly high ranked' 'commander for the FARC.'"[56] After the meeting, Franqui Flores and Efraín Campo were arrested by U.S. authorities in Haiti and extradited to New York.

89.     Franqui Flores and Efraín Campo's trial began in the Southern District of New York just under a year later. According to the evidence presented at trial, Cilia Flores "intended to use part of the proceeds of their drug trafficking to fund her December 2015 campaign for a position in the Venezuelan National Assembly."[57] Following a two-week trial, the jury convicted Efraín

---

[55] U.S. Attorney's Office, Southern District of New York, *Nephews of Venezuela First Lady Each Sentenced to 18 Years in Prison for Conspiring to Import Cocaine into the United States* (Dec. 14, 2017), https://www.justice.gov/usao-sdny/pr/nephews-venezuela-first-lady-each-sentenced-18-years-prison-conspiring-import-cocaine.

[56] *Id.*

[57] *Id.*

Campo and Franqui Flores, and on December 14, 2017, the nephews were each sentenced to eighteen years in prison.

90.     Meanwhile, in 2016, FARC entered into a peace agreement with the Colombian government, laid down its arms, and agreed to cease its drug trafficking operations. Some FARC members refused to comply with the deal and formed dissident factions—FARC-EP and Segunda Marquetalia—to take over FARC's cocaine productions and smuggling routes. To this day, both FARC-EP and Segunda Marquetalia coordinate with Cartel de los Soles and employ violence to facilitate their narcotics trafficking activities, including assassinations, extortions, hostage taking, and acts of terrorism.

91.     In or about 2017, Nicolás Maduro, in concert with and through his criminal collaborators in the Maduro Criminal Enterprise, worked with and directed other members of Cartel de los Soles to dispatch large volumes of cocaine to the United States in furtherance of their narco-terrorism conspiracy. The Cartel, at Maduro's direction, facilitated air shipments of cocaine to clandestine airstrips in Venezuela. Uniformed and armed FARC-EP personnel helped receive the cocaine and loaded the drugs into vehicles with secret compartments to be transported toward the Venezuelan coast for further distribution.

92.     During this time, civil unrest intensified even further within Venezuela. Under Maduro's Presidency, Venezuela has suffered economic collapse and democratic suppression—including censorship and imprisonment under suspect circumstances for members of any political opposition groups questioning or criticizing Maduro's rule.

93.     In July 2017, Maduro initiated elections—widely viewed as illegitimate—for the "Constituent Assembly" which would function to usurp the National Assembly's legislative power. In response, the United States issued a statement recognizing the democratically elected—and

opposition-led—National Assembly as the only legitimate branch of Venezuela's government. To this day, the U.S. Government does not recognize Nicolás Maduro or his administration as the legitimate government of Venezuela.[58]

94.     Maduro went on to hold an election and "illegally assumed the presidency of Venezuela, despite the lack of free and fair elections" on January 10, 2019.[59] The U.S. Department of State announced that Maduro's power retention tactics remain consistent: Maduro "arbitrarily jails or bans prominent political leaders and uses the distribution of food as a tool for social control."[60] The Department further described that "the illegitimate authoritarian regime led by Nicolás Maduro usurped control over the executive, judicial, citizens' power (which includes the prosecutor general and ombudsman), and electoral branches of government, and stood up a parallel, illegitimate legislative body alongside the existing elected one."[61]

95.     In November 2017, Defendant Maduro appointed Manuel Quevedo as the president of PDVSA and Minister of Petroleum. He remained the president of PDVSA until 2020.

96.     On February 15, 2019, OFAC designated officials aligned with Defendant Maduro included PDVSA president Manuel Quevedo.  On March 26, 2020, the District Court for the Southern District of New York indicted Maduro for his participation in the Maduro Criminal

---

[58] U.S. Dep't of State, *U.S. Relations with Venezuela* (July 18, 2024), https://www.state.gov/u-s-relations-with-venezuela/#:~:text=U.S.%2DVENEZUELA%20RELATIONS&text=The%20United%20States%20recognized%20and,of%20the%20Government%20of%20Venezuela; *see PDVSA US. Litig. Trust v. Lukoil Pan Americas LLC*, 65 F.4th 556, 562 (11th Cir. 2023) ("For more than five years, the executive branch has taken the position that the Maduro government is illegitimate.").

[59] *See* U.S. Dep't of State, *U.S. Relations with Venezuela* (July 18, 2024), https://www.state.gov/u-s-relations-with-venezuela/; *see also* Julie Turkewitz, *U.S. Recognizes Maduro's Rival as Winner of Venezuelan Election*, N.Y. Times (Aug. 1, 2024), https://www.nytimes.com/2024/08/01/world/americas/venezuela-election-gonzalez-maduro.html.

[60] U.S. Dep't of State, *U.S. Government Support for the Democratic Aspirations of the Venezuelan People*, https://2017-2021.state.gov/u-s-government-support-for-the-democratic-aspirations-of-the-venezuelan-people/ (last visited Oct. 30, 2024).

[61] U.S. Dep't of State, *2020 Country Reports on Human Rights Practices: Venezuela*, https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/venezuela/ (last visited Oct. 29, 2024).

Enterprise, including cocaine importation conspiracy, and possession and conspiracy to possess machineguns and destructive devices. U.S. Attorney General William P. Barr stated: "[t]oday we announce criminal charges against Nicolás Maduro Moros for running, together with his top lieutenants, a narco-terrorism partnership with FARC for the past 20 years."[62]

97. After indicting Defendant Maduro for his role in the narco-terrorism conspiracy, Geoffrey Berman, United States Attorney for the Southern District of New York, stated:

> Today we announce criminal charges against Nicolas Maduro Moros for running, together with his top lieutenants, a narco-terrorism partnership with the FARC for the past 20 years . . . The scope and magnitude of the drug trafficking alleged was made possible only because Maduro and others corrupted the institutions of Venezuela and provided political and military protection for rampant narco-terrorism crimes described in our charges. As alleged, Maduro and the other defendants expressly intended to flood the United States with cocaine in order to undermine the health and wellbeing of our nation. Maduro very deliberately deployed cocaine as a weapon. While Maduro and other cartel members held lofty titles in Venezuela's political and military leadership, the conduct described in the indictment wasn't statecraft or service to the Venezuelan people. As alleged, the defendants betrayed the Venezuelan people and corrupted Venezuelan institutions to line their pockets with drug money.[63]

98. The Maduro Criminal Enterprise is propped up and incorporates its criminal activities into its supposed "state-run" companies—PDVSA and Minerven.

---

[62] U.S. Department of Justice Office of Public Affairs, *Nicolás Maduro Moros and 14 Current and Former Venezuelan Officials Charged with Narco-Terrorism, Corruption, Drug Trafficking and Other Criminal Charges*, Mar. 26, 2020, https://www.justice.gov/opa/pr/nicol-s-maduro-moros-and-14-current-and-former-venezuelan-officials-charged-narco-terrorism; *see also* U.S. Department of State, *Nicolás Maduro Moros – New Target* (Mar. 26, 2020) https://www.state.gov/Nicolás-maduro-moros-new-target/ ("Maduro helped manage, and ultimately, lead the Cartel of Suns, a Venezuelan drug-trafficking organization comprised of high-ranking Venezuelan officials, as he gained power in Venezuela in a corrupt and violent narco-terrorism conspiracy with the Revolutionary Armed Forces of Colombia (FARC)").

[63] Dep't of Justice, *Nicolás Maduro Moros and 14 Current and Former Venezuelan Officials Charged with Narco-Terrorism, Corruption, Drug Trafficking and Other Criminal Charges* (Mar. 26, 2020), https://www.justice.gov/opa/pr/nicol-s-maduro-moros-and-14-current-and-former-venezuelan -officials-charged-narco-terrorism#:~:text=Berman.,crimes%20described%20in%20our%20charges.

99.     U.S. law enforcement identified almost a billion dollars in transfers from subsidiaries of PDVSA to the bank accounts of various Venezuelan contractors in South Florida.[64] From there, a substantial amount of money was transferred out of the contractors' accounts in Miami as bribes for the benefit of Venezuelan government officials.

100.     Both PDVSA and Minerven are sanctioned by the United States government. Regardless, the Maduro Criminal Enterprise uses both organizations to facilitate criminal narcotics trafficking and money laundering, all in the ultimate effort of supporting the Maduro Criminal Enterprise and keeping Maduro in power.

101.     The United States Department of Justice investigated the Maduro Criminal Enterprise as described above, finding "an international conspiracy to launder the PDVSA funds through Miami and several large-scale, international third-party money-laundering organizations. More specifically, the investigation revealed the use of Miami real estate and sophisticated false-investment schemes to launder hundreds of millions of U.S. Dollars."[65]

102.     The affidavit supporting the criminal complaint relating to the Maduro Criminal Enterprise's laundering of the PDVSA foreign exchange scam proceeds details a sprawling, multifaceted money laundering conspiracy amongst eight members of the Maduro Criminal Enterprise aided by a "network of professional money launderers" made up of money managers, brokerage firms, banks and real estate investment firms in the U.S. and abroad.[66]

103.     Defendant Moreno Pérez laundered and expended a significant portion of his ill-gotten gains in South Florida.  From 2012 to 2016—when his salary in Venezuela was $12,000 per

---

[64] *See* Giulida Saudelli, *How Millions of Dirty Dollars were Laundered out of Venezuela*, DW (Mar. 13, 2019), https://www.dw.com/en/how-millions-of-dirty-dollars-were-laundered-out-of-venezuela/a-47867313.

[65] *See* Affidavit of George F. Fernandez, *United States v. Guruceaga,* 18-MJ-3119-Torres (S.D. Fla.), available at https://www.justice.gov/criminal-fraud/file/1119981/download.

[66] *Id.*

year—Moreno Pérez's bank records show approximately $3 million in expenditures, primarily in South Florida. Additionally, bank records show that he paid approximately $1 million for a private aircraft and private pilot. Bank records also show that he spent more than $600,000 in credit or debit card purchases at stores primarily in the South Florida area (including tens of thousands of dollars at luxury stores in Bal Harbor, such as Prada and Salvatore Ferragamo), approximately $50,000 in payments to a luxury watch repair store in Aventura, and approximately $40,000 in payments to a Venezuelan beauty pageant director.

104. Similarly, the Maduro Criminal Enterprise uses the state-run mining company, Minerven to further profit the Maduro Criminal Enterprise. The importance of Minerven and Maduro's reliance on gold mining has only grown amongst the crackdown on Maduro's traditional money laundering and narco-terrorism schemes. As the Miami Herald reported, "Gold is Maduro's last resort."[67]

105. The United States Treasury Department sanctioned Minerven on March 19, 2019, stating:

> The mining and subsequent sale of gold has been one of the Maduro regime's most lucrative financial schemes in recent years, as hundreds of thousands of miners have mined for gold in dangerous, makeshift mines in southern Venezuela, all of which are controlled by the Venezuelan military, which, in turn, corruptly charges criminal organizations for access.[68]

After signing the executive order banning anyone in the United States from dealing with Minerven, then-President Trump's national security advisor John Bolton stated in a speech in Miami "The

---

[67] Antonio Maria Delgado et al., *supra* note 53.

[68] Press Release, U.S. Dept. of the Treasury, *Treasury Sanctions Venezuela's State Gold Mining Company and its President for Propping Up Illegitimate Maduro Regime* (Mar. 19, 2019), https://home.treasury.gov/news/press-releases/sm631.

Maduro regime has used this sector as a bastion to finance illicit activities, to fill its coffers, and to support criminal groups."[69]

106.    The South Florida-centered smuggling scheme perpetrated by the Madura Criminal Enterprise through Minerven works this way: "Large quantities of Venezuelan gold are secretly driven, flown, taken in boats or walked across the border to Colombia, sometimes with the help of the ELN guerrilla group.  Smugglers produce fake documents stating the gold was mined legally in Colombia.  The metal can then be sold — with seemingly clean hands — to importers in Miami and other places."[70]

107.    Both PVDSA and Minerven are, and have been for many years, integral to the Maduro Criminal Enterprise's profits, schemes, and ultimate goal of keeping Maduro in power.

## C.    The Maduro Narco-Terrorism Conspiracy's History of Detaining Americans

108.    As part of the Maduro narco-terrorism conspiracy, the Maduro Criminal Enterprise has resorted to abducting, detaining, interrogating, and torturing U.S. citizens to intimidate and coerce the United States Government into favorable concessions.

109.    During the entire span of time that Matthew Heath and Osman Khan were detained in Venezuela, the U.S. Department of State's Country Report on Human Rights Practices highlighted and condemned the mistreatment of prisoners in Venezuela.  In 2020, the report noted that:

> [B]eatings and humiliating treatment of suspects during arrests were common and involved various law enforcement agencies and the military controlled the illegitimate Maduro regime.  Torture and other cruel, inhuman, or degrading treatment or punishment of prisoners were also reported during the year.  Regime-aligned

---

[69] Roberta Rampton & Steve Holland, *Trump Increases Pressure on Venezuela with Sanctions on Gold* (Nov. 1, 2018), https://www.reuters.com/article/business/trump-increases-pressure-on-venezuela-with-sanctions-on-gold-idUSKCN1N65P5/.

[70] Antonio Maria Delgado et al., *supra* note 53.

authorities reportedly subjected detainees to asphyxiation, electric shock, broken bones, being hung by their limbs, and being forced to spend hours on their knees. Detainees were also subjected to cold temperatures, sensory deprivation, and sleep deprivation; remained handcuffed for extended periods of time; and received death threats to themselves and their relatives. Detainees reported regime-aligned security forces moved them from detention centers to houses and other clandestine locations where abuse took place. Cruel treatment frequently involved illegitimate regime authorities denying prisoners medical care and holding them for long periods in solitary confinement. The latter practice was most prevalent with political prisoners.[71]

These conditions are reiterated in the 2021[72] and 2022[73] reports.

110. These conditions are endured by many U.S. citizens wrongfully held in Venezuela. For example, in June 2016, U.S. citizens Joshua and Thamy Holt were kidnapped in Venezuela just days after their wedding. While in captivity, Mr. and Mrs. Holt were subjected to physical and psychological torture and abuse, simply because Mr. Holt was an American. The couple remained in captivity until May 26, 2018, following a meeting between Maduro and United States Senator Bob Corker.

111. Similarly, on November 21, 2017, Jorge Toledo, Tomeu Vadell, Alirio Zambrano, Jose Luis Zambrano, Gustavo Cardenas and Jose Pereira were taken hostage following a work conference for Citgo (a subsidiary of PVDSA) in Caracas, Venezuela. The Americans were falsely accused of being CIA officials and subjected to physical and psychological torture while in captivity, simply because they were Americans. The group became referred to internationally as the "Citgo Six."

---

[71] U.S. Dep't of State, *2020 Country Reports on Human Rights Practices: Venezuela*, https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/venezuela/.

[72] *See* U.S. Dep't of State, *2021 Country Reports on Human Rights Practices: Venezuela*, https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/venezuela/.

[73] *See* U.S. Dep't of State, *2022 Country Reports on Human Rights Practices: Venezuela*, https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/venezuela/.

112. In December 2019, Venezuelan authorities granted the Citgo Six house arrest.[74] Just two months later, authorities rounded up and re-jailed the Citgo Six after Juan Guaidó—Maduro's political opposition—visited President Donald Trump at the White House.[75] The Citgo Six were granted house arrest once again in April 2021 as a gesture of goodwill towards the Biden Administration, but yet again in October 2021, Venezuelan authorities rounded up the Citgo Six just hours after Alex Saab's extradition to Miami in October 2021.[76] Maduro publicly stated that in light of Alex Saab's extradition, he would cease negotiations with the political opposition (supported by the United States).[77]

113. Five of the Citgo Six were released alongside Matthew Heath and Osman Khan, serving as pawns for Maduro to secure the return of Franqui Flores and Efraín Campo. Amidst talks with U.S. officials in March 2022, the last of the Citgo six, Gustavo Cardenas, was released hours after Maduro—in a televised address— "indicated he would accede to U.S. demands that he resume negotiations with his [political] opponents as a first building block for any relief from U.S. sanctions that have been punishing the OPEC nation for years."[78]

114. Also in March 2022, while assisting a friend with a passport issue at the Colombia-Venezuela border, U.S. citizen Eyvin Hernandez was accused of being a spy and charged with espionage, terrorism and conspiracy. Hernandez was held hostage with other Americans in a maximum-security prison outside Caracas under the control of the DGCIM.

---

[74] *See* Rachel Pannett, *Venezuela Suspends Talks with Opposition After Maduro Ally Extradited to the United States*, Wash. Post (Oct. 17, 2021), https://www.washingtonpost.com/world/2021/10/17/venezuela-saab-extradition-citgo-opposition-talks/.

[75] *See Id.*

[76] *See Id.*

[77] *See Id.*

[78] Joshua Goodman, Regina Garcia Cano & Eric Tucker, *American Freed from Venezuela Says His 'Nightmare' Has Ended*, Associated Press (Mar. 9, 2022), https://apnews.com/article/russia-ukraine-business-europe-venezuela-caracas-daae694f5984d418627cbb3cb1885c43.

115.    Another U.S. citizen, Jerrell Kenemore, was wrongfully detained in Venezuela that same month.[79]

116.    In September 2022, U.S. citizen Joey Cristella traveled to Venezuela to visit his fiancée and get baptized when he was detained and charged with an immigration infraction for traveling without a visa.  These charges were quickly escalated to conspiracy to commit terrorism.

117.    And in October 2023, yet another U.S. citizen, Savoi Wright, was wrongfully detained in Venezuela.

118.    On December 20, 2023, six Americans, Joseph Cristella (approximately 15 months captive), Eyvin Hernandez (630 days captive), Jerrel Kenemore (approximately 21 months captive), Savoi Wright (57 days captive), and two unnamed Americans, who were wrongfully detained in Venezuela were released.  Consistent with the Maduro Criminal Enterprise's agreement and plan to intimidate and coerce the United States Government into favorable concessions, these individuals were finally freed in exchange for the release of Defendant Alex Saab, who was being held in jail in Miami, Florida for conspiracy and money laundering.

### D.    The Maduro Narco-Terrorism Conspiracy's Crimes Against Matthew Heath and His Family

119.    Plaintiff Matthew Heath served in the U.S. Marine Corps from 1999 to 2003.  He was highly decorated for actions taken in the Battle of Nasiriyah early in the Iraq war.  After honorably serving his country and fellow citizens, Mr. Heath worked as a security consultant for the U.S. Government, including on the Central Poppy Eradication Program in Afghanistan and was targeted at his home by a suicide bomber in Kabul as a result of his counter-narcotics efforts.

---

[79] *See* Marianna Parraga et al., *Americans Freed by Venezuela in US Prisoner Swap Land at Texas Base*, Reuters (Dec. 21, 2023) https://www.reuters.com/world/us/us-has-freed-close-ally-venezuela-president-swap-jailed-americans-ap-2023-12-20/.

120.     After finishing his consulting work for the U.S. government and seeking a quieter life, Mr. Heath purchased a small 53-foot trawler hulled yacht, the "Purple Dream," with plans to start a charter and tourism business in the Caribbean.

121.     In March 2020, Mr. Heath commenced his journey with a crewman he hired in Florida.  Mr. Heath and this crew member first stopped at a boat yard in Honduras where they could clean up the boat and make some necessary repairs, then made their way to Costa Rica to rest and prepare for their next stop in Cartagena, Colombia.  After they reached Colombia, Mr. Heath decided to spend time with an old friend while the crew member took the Purple Dream to dock safely in Aruba.

122.     Mr. Heath—still working on his Spanish—befriended a translator in Cartagena who helped him with various errands and outings.  The translator became a trusted companion and resource to Mr. Heath.  By summer's end, Mr. Heath wanted to reconnect with the crew member and the Purple Dream in Aruba, but the COVID-19 pandemic lockdown made travel extremely difficult.

123.     In or around the beginning of September 2020, the translator told Mr. Heath that he had friends in Punto Fijo, Venezuela, where boats traveled to Aruba every day.  The translator offered to help Mr. Heath get back to his boat, and Mr. Heath accepted.

124.     On or around September 9, 2020, Mr. Heath and the translator drove to a remote native reservation at the Colombia-Venezuela border.  A pastor living on the reservation drove Mr. Heath and the translator across the border on unmarked, dirt roads to a house where they were allowed to stay a couple of nights, until a DGCIM agent picked up Mr. Heath and the translator in the early morning and brought them to Maracaibo.  There, they were instructed to board a taxi,

which Mr. Heath—relieved after a long and unpredictable journey—believed would bring him to Punto Fijo. Along the way, the taxi picked up a member of the Venezuelan National Guard.

125. Shortly thereafter, the Venezuelan National Guard stopped the taxi at a checkpoint, forced Mr. Heath to exit the vehicle, and searched and seized his personal belongings, including his cell phone, U.S. passport, state of Tennessee identification card, and some cash. Tarek Saab retweeted photos of these items (originally posted by the Venezuelan Exterior Minister's official twitter account) on September 14, 2020.[80]

126. Members of the Venezuelan National Guard, operating under the direction and control of Maduro's Criminal Enterprise, held Mr. Heath at the checkpoint until the afternoon, when they turned him over to DGCIM agents. The agents brought Mr. Heath to an installation in Falcón, where they made him undress and locked him inside a dark room. DGCIM agents interrogated Mr. Heath at this facility about the location of a CIA base until about six in the morning, when they flew him to another DGCIM facility in Caracas.

127. In Caracas, agents took a still undressed Matthew Heath outside, hosed him with cold water, and strapped him to wire mesh connected to a car battery. For the rest of that day and into the morning, counterintelligence officers intermittently shocked Mr. Heath with the device while questioning him (again) about the location of a CIA base, the contents of various photos, and for the passcode to his phone. At one point, agents ordered another prisoner to rape Mr. Heath.

---

[80] *See* Tarek William Saab (@TarekWilliamSaab), Twitter (Sept. 14, 2020), [https://web.archive.org/web/20200917055249/https://twitter.com/TarekWiliamSaab]; Cancillería Venezuela (@CancilleriaVE), Twitter (Sept. 14, 2020, 1:01PM) https://x.com/CancilleriaVE/status/1305552335918202880; *see also* Cancillería Venezuela (@CancilleriaVE), Twitter (Sept. 14, 2020, 12:52PM) https://x.com/CancilleriaVE/status/1305549993013637129 (first tweet in thread explaining Tarek Saab "shared that United States citizen, Matthew Jhon [sic] Heath was detained together with Venezuelan citizens . . . .") (translated from Spanish to English).

When the other prisoner refused, one DGCIM officer threatened to rape Mr. Heath with a nightstick if he did not reveal the password to his cellular phone.

128.    Terrified of being violated, humiliated, and further abused, Mr. Heath relented. DGCIM officers used the password to download the contents of Mr. Heath's cellular phone and satellite phone but did not find evidence of any incriminating conduct.  Unable to secure a confession or any evidence against Mr. Heath, he was returned to Falcón where agents feigned a new arrest and presented Matthew Heath with new "evidence."  The planted items included several machine guns, a U.S. Anti-Tank rocket (AT-4), a large amount of ammunition, explosives, cash and special communications equipment that were too large to fit inside the compact taxi Mr. Heath traveled in.

129.    Mr. Heath learned that he was being wrongfully detained for fictitious charges of treason, terrorism and arms trafficking.  Within days of his capture and in furtherance of the Maduro Criminal Enterprise's plot to use Matthew Heath as a bargaining chip to gain concessions from the U.S. government, Maduro announced to the press on September 11, 2020, that Venezuelan authorities captured a Marine and "US spy" surveilling the Amuay and Cardon oil refineries.[81]

130.    Just three days later, Defendant Tarek Saab announced at a nationally televised press conference that the man captured was Matthew Heath.[82]  Tarek Saab further reiterated the false accusations that Mr. Heath was a spy plotting to attack oil refineries and electrical service to

---

[81] *U.S. 'Spy' Captured Near Venezuelan Oil Refining Complex, Claims Maduro*, Reuters (Sept. 11, 2020), https://www.theguardian.com/world/2020/sep/12/us-spy-captured-near-venezuelan-oil-refining-complex-claims-maduro.

[82] *See* A recording of the broadcast is available at: Luigino Bracci Roa desde Venezuela, *Fiscal General da Detalles de Espía Estadounidense Capturado, que Saboteaaría Refinerías Venezolanas*, Youtube (Sept. 14, 2020), https://www.youtube.com/watch?v=XU5ojVZMD1o.

sow "sabotage and destabilization" in Venezuela.[83]    Tarek Saab also summarized the press conference on his official Twitter page.[84]

131.    Following Tarek Saab's public announcement of the fraudulent accusations, Mr. Heath was forced to participate in a show "trial" built upon fabrications.

132.    All the while, Matthew Heath was wrongfully detained in inhumane and unsanitary conditions, three stories below ground.  During his wrongful captivity, Reynaldo Hernández, Salas Rivas, and other DGCIM agents working at the direction and in furtherance of the Maduro Criminal Enterprise tortured Mr. Heath for days on end, including by electrocution, severe beatings, food and water deprivation, and isolation in solitary confinement.  On at least one occasion, DGCIM agents placed a plastic bag over Mr. Heath's head until he nearly suffocated. On multiple occasions, DGCIM agents forced Mr. Heath into a torture device known as "El Tigrito" designed to restrict the victim's movement and to simulate the experience of suffocation. El Tigrito was used to deprive Mr. Heath of light, gave him no room to sit down, and his hands were kept restrained behind his back using handcuffs while he was kept in the device.  Mr. Heath was placed in El Tigrito at least six times over his two-year imprisonment, with the longest stretch lasting several days.  While in El Tigrito, Mr. Heath was given no food, no use of bathroom facilities, and extremely little water.

---

[83] *Id.*

[84] *See* Osmary Hernández, *Fiscalía de Venezuela Acusa de Terrorismo y Tráfico de Armas a Ciudadano de EE.UU.*, CNN Venezuela (Sept. 14, 2020), https://cnnespanol.cnn.com/2020/09/14/fiscalia-de-venezuela-acusa-de-terrorismo-y-trafico-de-armas-a-ciudadano-de-ee-uu ("En una conerencia de prensa luego resumida en su cuenta official en Twitter, Saab dijo que Heath tendría entre sus objetivos atacar el Sistema eléctrico y refinerías petroleras en momentos en que el país vive una aguada crisis de combustible."); English Translation: "In a press conference later summarized on his official Twitter account, Saab said that Heath would have among his objectives to attack the electrical system and oil refineries at a time when the country is experiencing a severe fuel crisis."

133.    At least twice, DGCIM agents stripped Matthew Heath naked to humiliate and torture him: in one instance, to lock him in a room kept at freezing and/or extremely cold temperatures; in another, to pour ice water over him and threaten him with rape at gunpoint.

134.    Mr. Heath experienced years of isolation, physical and mental deprivation and abuse, and acts of terror intended to make him compliant with his captor's demands.  Matthew Heath's captivity was also used as leverage for the Maduro Criminal Enterprise's efforts to coerce the United States to acquiesce to their demands for prisoner swaps.

135.    For over two years, Mr. Heath fought back.  He resisted his captors, breaking cameras and microphones set up to surveil prisoners, talking back to his guards, and refusing to attend the sham court proceedings.  To boost morale, Mr. Heath made a point to tell other prisoners every week—through the tiny window of his cell—that they would be going home that week.  Mr. Heath's resistance subjected him to yet more torture and beatings.

136.    In June of 2022, in an effort to shock Defendant Maduro and his criminal collaborators, Mr. Heath feigned a suicide attempt by kicking out a pipe from his prison cell toilet, smashing off a shard of porcelain from the toilet bowl, and using it to cut a gash in his arm that bled heavily.  His captors rushed him to the hospital, which prompted the U.S. special envoy for hostage affairs, Roger Carstens, and Ambassador James B. Story, to fly to Caracas and negotiate for the emergency release of Mr. Heath and Mr. Khan given the state of their physical health. Upon information or belief, Venezuelan government actors working at the direction of Maduro were prepared to release Mr. Heath and Mr. Khan that day, but negotiations fell through when a member of Juan Guaidó's campaign team posted a picture of Guaidó posing with Ambassador Story, provoking the Maduro Regime.

137. Thus, Mr. Heath remained in custody for several more months until the Maduro Criminal Enterprise could use him as leverage in the October 1, 2022 prisoner swap.

138. Throughout Matthew Heath's imprisonment, his family lived in constant fear that he would be killed.

139. His parents—Robert ("Bobby") Heath and Connie Haynes—were devastated. The two held together and comforted one another through action. Despite feeling that they were inside a constant nightmare, the two advocated tirelessly for the return of their son.

140. From September 9, 2020 to June 16, 2021, Matthew's parents never even heard his voice. Each day they woke up and were consumed by little else but concern for his safety and a plan to bring him home. The family as a whole was always tight-knit, and though they banded together over the shared nightmare of Matthew's kidnapping, confinement, and torture, normal family activities were put on hold. They could not bring themselves to celebrate holidays in his absence, and spent time fundraising, advocating to politicians and advocacy groups, and, eventually, even trying to negotiate with Matthew's captors. Supposed representatives of the Maduro Criminal Enterprise made constant calls and texts. The family spent close to a quarter million dollars trying to bring Matthew home through payments to Matthew's Venezuelan lawyer, translators, and through extortionist plots from the Maduro Criminal Enterprise offering results that never came. Bobby ended up having to sell half of his beloved farm just to stay above water.

141. Connie missed significant swaths at work while she was advocating for her son's return. She traveled to Washington D.C. from her Knoxville home multiple times to advocate for her son. Matthew's family refused to let him be forgotten by those in power. Connie completed all of this tireless advocacy while simultaneously being unable to eat or sleep causing physical and mental strain due to the worry she felt for her son.

142.     Perhaps because of her vocal advocacy, Connie recalls one particularly frightening moment when Defendant Diosdado Cabello was speaking about her son with a picture of her (Connie) in the background—with a target superimposed over her face.

143.     Compounding the terror Matthew's parents felt for their son, they also lamented the pain they saw in their young grandson's eyes. At only eleven years old when his father was taken, the family did their best to protect Matthew's son, I.M.H., but no amount of sparing him the details could fix the effects of losing his father in such a public and frightening manner.

144.     Matthew's siblings were similarly affected. In late September 2020, Mr. Heath's sister, McKenzie Daniels, drove to her mother's house for a regular visit. Upon arrival, McKenzie could sense that something was wrong. Through tears, Connie delivered the harrowing news that McKenzie's beloved older brother was captured and detained in Venezuela.

145.     McKenzie was instantly devastated. Just weeks prior, McKenzie learned that she was pregnant with her first child—the child who would also make Matthew an uncle. Although she tried her best to manage stress and preserve her well-being for a healthy pregnancy, McKenzie constantly worried about what might happen to her brother. McKenzie gained fifty-five pounds, and her blood pressure skyrocketed. She vomited frequently and felt sick to her stomach "twenty-four hours a day, seven days a week." In contrast, McKenzie's second pregnancy (following her brother's return home) has been virtually free of these symptoms.

146.     McKenzie's mood and lifestyle dramatically changed during Mr. Heath's detention. A typically outgoing person who avoided being at home, McKenzie quit her job and stayed home day and night. She would only leave the house for medical appointments, family events and visits, and to help Connie with fundraisers for Matthew.

147.     As time passed, McKenzie increasingly felt a sense of helplessness about her brother.  On the precipice of bringing new life into the world, McKenzie confronted the cruelty, injustice, and pain in the world each day that her brother was not returned home. At times, McKenzie's feelings of helplessness were so overwhelming that she battled thoughts of suicide. McKenzie held on through these acutely difficult moments for her child, for Matthew, and for her family.

148.     McKenzie gave birth to her son while Matthew was still detained.  Although having a child brought joy to McKenzie and her family, McKenzie could not help but feel anger at the Maduro Criminal Enterprise.  They stole from McKenzie and Matthew the joy of sharing the moment when she became a mother.  A cloud loomed over what should have been one of the most purely blissful moments in McKenzie's life: the knowledge that her brother may never meet her child.  Even after their happy reconciliation, the fact remains that Matthew missed the birth of McKenzie's son—the child who made him an uncle.  When McKenzie first introduced Matthew to her then-six-month-old son, she felt a deep sadness that the Maduro Criminal Enterprise had rendered her brother a stranger to his first nephew.  Although Matthew and McKenzie's son have developed a relationship over time, McKenzie still mourns the precious moments of her son's early life that she could not share with Matthew.

149.     Matthew's brother, Devin Waller, recalls similar feelings of despair during Matthew's captivity.  The two brothers were always close, and Devin was a young man just embarking on adulthood, attending college when Matthew was captured.

150.     Devin recalls symptoms that echoed those of Matthew's parents and sister—a sense of being unable to regularly eat or sleep, a pervasive sense of exhaustion.  Matthew served as a role model and friend to Devin, and his presence permeated even Devin's sleep.  Devin recalls

dreaming on multiple occasions of Matthew—with his brother always encouraging him that "it would be okay" and instructing him on how to stay strong and keep helping. Devin followed that directive—he too tirelessly conducted multiple fundraisers alongside his mother, Connie. He too traveled to Washington, D.C. to advocate for his brother and appeared in the media to spread the word about his brother's capture and to combat the false media narrative that the Maduro Criminal Enterprise put forth describing his loving brother as a "terrorist." Despite working as a diesel technician by trade, Devin felt during this time period that Matthew was his full-time job.

151. Although all of Matthew's family members felt the effects of his unjust imprisonment, arguably no one felt that loss more than his then-11-year-old son. I.M.H. recalls that holidays were particularly hard without his father, and they largely went uncelebrated. I.M.H.'s close relationship with his father was suddenly stripped away from I.M.H. in violent fashion, while he was still obligated to go through day-to-day life as normally as possible.

152. Father and son enjoyed an incredibly close bond, and I.M.H. lost out on having his father for pivotal years of his youth—missing the most important male figure in his life to guide him into his formative teenage years. Matthew missed out on those years as well, knowing that time with his son cannot be replaced, despite their joy on having each other again today. I.M.H. dealt with having to continue to go to school as an 11-year-old with no peers that could know what he was experiencing. Although I.M.H. remains a resilient and impressive young man today, like any child, he suffered from the sudden and volatile loss of his father in such a violent manner. While his family attempted to shield him from the worst of the details, I.M.H. knew that any day he could learn his father was killed. While without understanding the entirety of the situation, he knew his father was in a dangerous predicament. He predictably struggled more in school, and in contrast to his record before or since, acted out. Compounding this trauma, I.M.H. also had to deal

with defending his father and family from the false Maduro Criminal Enterprise's allegations that his father was a terrorist—no small feat for a child already going through so much. The absence of his father during this time is something no child should have to experience and is a weight both father and son still deal with today.

153.    On September 13, 2022, the two Venezuelan drug traffickers with family ties to Defendant Maduro and his wife Defendant Cilia Flores, Franqui Flores and Efraín Campo, received an executive grant of clemency for their drug trafficking convictions.

154.    At 6 A.M. on the morning of October 1, 2022, Matthew Heath was told to get dressed to go home. He boarded a plane with six other wrongfully detained Americans: Jorge Toledo, Tomeu Vadell, Alirio Zambrano, Jose Luis Zambrano, Jose Pereira, and Osman Khan. Having been taunted with this premise before, he did not believe he would actually be released until U.S. Ambassador Roger Carstens boarded the prison transport aircraft on the ground in Canouan, and island in Saint Vincent and the Grenadines.

155.    The plane carrying Matthew Heath and the other six American hostages landed at a U.S. military base in Texas late that evening. Matthew Heath's family greeted him at a hospital there the following day. His mother and aunt were speechless and hugged him for the first time in years. Although he was unable to see the faces of some of the other American prisoners around him, leaving any of his fellow captives behind was difficult. There were at least six other American prisoners still being held when Matthew and Osman were released.

156.    Since returning home, Matthew Heath has continued to suffer the effects of his captivity by narco-terrorists. Matthew Heath lost his charter business and the boats he spent his life savings purchasing in order to operate a charter business. He has been unable to feel safe to freely travel outside of the United States, despite once enjoying world travel.

157.    Most devastatingly, Matthew Heath's imprisonment from approximately September 9, 2020, to October 1, 2022, constitutes years of lost time with loved ones, that none of them can ever recover.  Matthew, his son, his parents, and siblings all still live with the effects of his kidnapping, torture, and prolonged wrongful captivity.

**E.     The Maduro Narco-Terrorism Conspiracy's Crimes Against Osman Khan and His Family**

158.    In the spring of 2021, Osman Khan graduated from the University of Central Florida with a degree in finance and real estate.  Like many college graduates, 24-year-old Osman was excited to build a life for himself: He accepted a full-time job and relocated to Bucaramanga, Colombia with a college friend, looking forward to experiencing travel, a new culture, and embarkment on a promising new career.  One evening, he found romance after a chance encounter with a waitress, Rosa.  Over several months, Osman and Rosa developed a committed relationship.  Rosa's father visited the couple in Colombia and encouraged them to come see the rest of the family in Venezuela.  Although Mr. Khan had some reservations, Rosa's brother—a Venezuelan National Guard Captain—reassured Osman that he would be able to enter safely without a visa.  The lovestruck 24-year-old Osman reluctantly agreed, despite some trepidation over crossing the border.

159.    On January 15, 2022, at the direction of Rosa's brother, the couple took an overnight bus ride to the Arauca River, where Osman boarded a motorized canoe with Rosa and her father.  As soon as they crossed into Venezuela, Venezuelan National Guard members apprehended Osman and his girlfriend.  Under the false impression that Colombia and Venezuela were part of a travel union similar to that of the European Union, Osman presented his U.S. passport.  His passport along with his American-accented Spanish tipped off the agents, who started yelling: "Gringo!"

160.     The Guard members quickly escorted Osman to a deteriorating, military-owned building for interrogation.  As he was escorted through the building, Osman saw people that were handcuffed and placed with their faces to the floor.  In another room, people were stacked "like logs on a pile."  Terror settled in.

161.     In the interrogation room, Military intelligence officials stripped Mr. Khan naked, questioned him at gunpoint, and accused him of being a spy.  Officials of the Maduro Criminal Enterprise electrocuted and waterboarded him—even forcing him to eat his own vomit.  In between periods of torture, agents of the Maduro Criminal Enterprise placed Mr. Khan on a metal bed with springs sticking into his back.

162.     Like Mr. Heath. Mr. Khan too was forced to endure the torture of being placed in "El Tigrito" where he was unable to move, sit, or have use of bathroom facilities.

163.     On January 17, 2022, Osman Khan's mother, Tania Valdes, was in Florida when she received on her phone a text containing a photo of her son and an incomplete voice message that sounded like Osman begging for help.  Tania—confused and not receiving responses from Osman—sent the message to her daughter Jasmin Khan and asked her what she thought it was. Jasmin, then preparing for another semester at Georgetown in Washington, D.C., did not know what she was opening.  But after listening, she called her mom, distraught, to say she believed that Osman was taken hostage.

164.     Mr. Khan's captors wasted no time capitalizing on his family, responding to Tania's frantic responses offering help to Osman with extortion: they demanded $1,200 in exchange for Osman's freedom.  Tania, afraid that full compliance would prompt the captors to believe the family was wealthy (and continue extorting them until they had nothing left), pleaded with her

son's captors and negotiated down to a $600 payment. But after Tania sent the money, she heard nothing.

165. Tania, extended family, and friends turned the Khan family's dining room into an investigation headquarters—they set up laptops and got to work. Together, they discovered that the Zelle account Osman's captors gave to Tania was connected to a Venezuelan National Guard Member. Tania called the State Department, but because the United States had suspended diplomatic relations with Caracas, they referred her to the U.S. embassy in Bogotá, Colombia. The family was at a dead end: there was little to do but wait to hear whether Osman Khan was alive, let alone whether he would be released.

166. After four days of silence, Mr. Khan's captors allowed him to make a five-minute video call—when Tania picked up the phone, she saw the shockingly thinner and distressed face of her son. Terrified that any wrong word would provoke more violence from his captors, he said: "I'm so sorry, Mom." Tania was heartbroken at how shaken and afraid her son appeared.

167. Although Osman hoped he would be released, guard members and DGCIM agents transported him instead to the infamous House of Dreams prison. Throughout his detention, he would hear DGCIM agents, including Reynaldo Hernández and Salas Rivas, refer to the "Casa de los Suenos" (the House of Dreams and sometimes referred to as Maduro's little prison). Sometimes, when Osman begged the guards to free him, they responded saying that he'd only be freed at Maduro's command.

168. Mr. Khan was charged with terrorism, human trafficking, and conspiracy, and forced to participate in illegitimate pretrial criminal proceedings. When Tania learned about the charges against her son, she felt sick to her stomach. She knew her son was not capable of such heinous crimes, and instantly saw through the pretense of detaining her kind, bright child.

Although a judge dismissed the terrorism and human trafficking charges against Mr. Khan on January 21, 2022, the conspiracy charge remained, and Mr. Khan remained in captivity awaiting a trial date that would never come.

169.    During his captivity, DGCIM officers, including Reynaldo Hernández and Salas Rivas, acting at the direction and in furtherance of the Maduro Criminal Enterprise, tortured and harassed Mr. Khan.  On numerous occasions, officers placed him in a frigid cell and doused him with cold water.  Mr. Khan quickly lost weight because the officers systematically deprived him of food and water, to the point Osman was reduced to drinking toilet water in order to survive.  Officers forced Mr. Khan into stress positions, like standing for hours on end.  Maduro's officers forced Osman into solitary confinement, and for most of his confinement in his typical cell, the window on his cell door remained covered.

170.    Throughout his detention, DGCIM agents forcibly injected Osman with medications that caused paralysis that would last for days, seizures, terrifying hallucinations, weight loss, and severe gastric pain and digestive problems.  Osman begged the agents not to inject him, but they never heeded his desperate pleas.

171.    The DGCIM agents also sedated Osman on a regular basis.  His body became so accustomed to the sedation that, when he went too long without it, he would experience violent withdrawal symptoms.  Osman began to feel helpless, and seeing no end to his torture, attempted to take his own life using a piece of glass from a mirror in his cell.

172.    One thing that helped keep Osman alive was the relationship he developed with Matthew Heath.  Osman recalls hearing Matthew's voice echo down the halls of their cramped cells, encouraging Osman to be strong, and trying to distract him from their unimaginable

circumstances. Matthew and Osman developed a strong relationship, with Matthew serving as a surrogate big brother to the younger Osman. Their friendship remains strong to this day.

173. All the while, Tania, Jasmin, and Osman's younger brother, A.I.K., survived each day with constant uncertainty for the fate of their loved one. A.I.K. was just fourteen years old when his brother was captured. Although Tania and their extended family tried to protect A.I.K. from the information that his brother had been detained by violent, authoritarian, terrorists, A.I.K. quickly gathered that his best friend and role model was in serious trouble. When A.I.K. learned that the charges against his brother risked a sentence of some thirty years in prison, A.I.K. shut himself in the bathroom and crawled into a ball, sobbing. The prospect of not seeing his older brother until he was over fifty years old, if ever again—the possibility that they would miss so much of each other's lives—was too painful to bear.

174. At the same time that A.I.K. was dealing with these intense emotions, he felt a sudden responsibility to be strong for his mother as the new "man of the house." Although A.I.K. was scared and anxious, he hid his feelings from everyone—family and friends alike—in an attempt to avoid creating additional problems for his family. A.I.K. increasingly felt isolated from his friends who confided in him about typical high school drama, feeling guilty that he struggled to sympathize with the mundane troubles of his peers while managing an unimaginable crisis at home. A.I.K., once known for being a friendly and upbeat friend to many at school, found himself retracting from social life entirely.

175. A.I.K.'s grades fell in school as he was increasingly unable to focus. In addition to worrying and wondering about his brother, his mom, and his sister, A.I.K. often arrived at school exhausted. He had trouble falling asleep at night when left alone to think about what his brother was going through, and what might happen to him in the future. A.I.K. also dealt with intense

feelings of anger at the people responsible for Osman's captivity—sometimes, he slept for just a few hours, tossing and turning at the thought that people were hurting his brother, and there was nothing he could do.

176. Osman's sister Jasmin also experienced a roller coaster of emotions and isolation. Jasmin and Tania's exchange in which they discovered that Osman was being held hostage occurred just a few days before her final semester at Georgetown University was set to begin. Jasmin—distraught—felt that she could not attend school and go back to normalcy. Tania begged Jasmin to keep going, so, two weeks into the semester, Jasmin explained to her professors and to Georgetown administrators what her family was going through and why she had not appeared for classes.

177. Although Jasmin started going through the motions of college life, she felt like a zombie—like A.I.K., Jasmin found it nearly impossible to stay engaged. She withdrew from social life except for events where she could drink, and alcohol became a way to escape the intense pain and worry. Jasmin would go days without sleeping, because when she tried to fall asleep, she would just imagine her brother alone, afraid.

178. Jasmin's grades suffered particularly as she became more engaged in advocacy efforts for her brother. Jasmin and Tania started meeting with the State Department on a weekly basis and would strategize before and after each and every meeting—preparing and debriefing, analyzing every detail of what authorities told them. Jasmin and Tania were in constant contact, trying to dream up ways to bring Osman home. Jasmin became Osman's advocate to lawmakers and anyone who would listen in D.C.—she even reached out to a renowned hostage negotiator for help.

179.     Likewise, Tania struggled to keep up with work and responsibilities amidst Osman's detention.  Tania would burst out in tears at work, having to walk outside to collect herself.  She barely slept and struggled to eat for nearly four months.  At times, Tania was so overcome with hopelessness about her son's fate that she experienced thoughts of suicide.  Finally, she went to a regular appointment with her primary care doctor and disclosed her family's distressing situation, explaining how hard it was to get through each day.  Tania's doctor prescribed anti-anxiety medication, which helped Tania to get by, but Tania knew she would not feel better until her son was home.  She constantly excused herself from meetings to answer calls from Osman, family members, and anyone else helping with advocacy efforts for Osman.

180.     On top of her day job, Tania worked about forty hours a week trying to keep Osman alive and ensure his release.  Although her day job was exhausting, Tania needed the money to cover her bills and to send $400 to $500 to a Venezuelan resident every week, who promised to buy Osman food.  Eventually, Tania found out that it was a fraud—Osman never received food from the individual.  All in all, DGCIM agents and other Venezuelan residents seeking to capitalize on the Khan's tragedy extorted about $20,000 from Tania.

181.     Eventually, Osman was allowed to call family members more regularly, and both Jasmin and Tania experienced intense anxiety at the prospect of missing his calls.  Because they could not anticipate when Osman would call, and the guilt of missing any single phone call was overwhelming, Jasmin and Tania lived their lives "attached" to their phones, constantly checking to make sure it was on hand, to make sure it was charged, and to make sure they were in a place with cell service.  Jasmin even experienced "phantom calls," where she would hear her phone ring and run to it, only to find no one had in fact called.

182.     Jasmin and Tania recorded every call they had with Osman so that they could listen to each other's calls and debrief.  Jasmin and Tania wanted to say things to help Osman feel hopeful and supported but knew that DGCIM agents were listening and feared that their comments might prompt retaliation against Osman.  On one occasion, Tania said to Osman that "the U.S. Government doesn't care about you" in the hopes that the agents would overhear that and release him if he could not be used as a political pawn.  Upon listening to the call, Jasmin panicked, fearing what might happen if the agents saw Osman as disposable.  Indeed, the guards did torture Osman after that phone call, and Tania and Jasmin waited in agony by their phones for another call.

183.     Jasmin barely made it through her final semester at Georgetown but could not find a way to truly celebrate the accomplishment.  Osman's absence was always a tremendous weight on her shoulders, but it was intensified at the moments she wanted to share with him most.  Jasmin spent her graduation day sipping from a flask, faking smiles in photos, and trying to hold herself together.  What should have been one of the happiest days of her life is a day Jasmin would rather not remember.

184.     After graduation, Jasmin had no time to decompress—she immediately started on the job hunt so that she could afford to remain in D.C. and advocate for her brother.  One day, Osman called during a job interview, and Jasmin had to quickly explain to the prospective employer that her brother was a hostage and that she had to take the call.

185.     In June 2022, U.S. government officials told Jasmin and Tania that in light of Mr. Khan's deteriorating health in captivity, returning Osman home was a top priority of the U.S. envoy to Venezuela that month.  Tania, elated at the possibility of seeing her son again, set up his room in anticipation of his return—washing his blankets, setting out clothes, and buying all of his favorite foods.

186.    But after the envoy embarked on their journey, Professor Bergman met with Jasmin over lunch and shared that Ambassador James Story had made a social media post indicating his support of Juan Guaidó, Maduro's opposition.  He told Jasmin that, in light of Ambassador Story's post, there was no chance her brother would come home on that trip.  Jasmin called her mom to once again deliver terrible news about her brother.

187.    Three months later, on September 13, 2022, the two Venezuelan drug traffickers with family ties to Defendant Maduro and his wife Defendant Flores, Franqui Flores and Efraín Campo, received an executive grant of clemency for their drug trafficking convictions.

188.    On the morning of October 1, 2022, Mr. Khan was told that he would be released.  Mr. Khan was thrown on the tarmac and told to grab his bag and run to the American aircraft.  He loaded onto a small plane along with Mr. Heath and five of the Citgo Six.  After being held hostage for 259 days, Osman Khan was heading home to finally see his family.  He did not allow himself to believe it until the plane actually landed in the United States—after the torture he endured, he believed this transport was just another trick of the Venezuelan authorities until the very last moment.

189.    Tania, Jasmin, and A.I.K. consider the day Osman returned to be the best of their lives, but Osman returned to the United States in extremely poor health.  Mr. Khan had three seizures on the plane ride to Texas, such that Matthew Heath feared for Mr. Khan's life.  Mr. Khan had to be hospitalized almost immediately, where he suffered through more seizures. Due to the DGCIM agents routinely sedating Mr. Khan, he also experienced violent drug withdrawal symptoms.

190.     After months of torture, Osman felt disoriented by his family's joy—he thought they did not understand what he had been through.  As Osman suffered through physical and mental anguish, the family wondered if they would ever truly get their son and brother back.

191.     Osman Khan continued to experience seizures following his release.  Due to the forced injections he endured, Mr. Khan lives with a collapsed vein in his arm and serious gastrointestinal issues.  Eating meals now regularly prompts discomfort and pain for Mr. Khan.  Although Osman has tried his best to move forward, he experiences far more anxiety in day-to-day life than ever before, panicking during everyday activities.

192.     Living through Osman's detention fundamentally changed the Khan family's lives.  During formative years in their education and coming of age, Jasmin and A.I.K. confronted horrors that few people ever experience—both Jasmin and A.I.K. feel that this experience hardened them, making them less trusting of strangers and the world in general.  Tania, once an adventurous and regular traveler, finds that now, no amount of planning or safety measures can prevent her from spending an entire trip being hypervigilant.  Jasmin experiences paranoia and is fearful that there may be members of the Maduro Criminal Enterprise spying on the family.  In sum, Osman, Jasmin, Tania, and A.I.K. live each day suffering the consequences of the Maduro Criminal Enterprise's crimes against their family.

193.     The imprisonment and torture of Matthew Heath and Osman Khan at the hands of the Maduro Criminal Enterprise, has had significant adverse economic consequences; has cause harmed to their familial relationships; and detrimentally impacted their mental and physical health.

194.     The White House held a press call after Matthew Heath, Osman Khan and the five Citgo oil executives were release and stated:

> The safe return of these seven Americans is the outcome of tough negotiations.  We have been raising their cases with the Venezuelans for months now and pursuing

just and timely outcomes. When over the course of those negotiations it became clear that one particular step was required to garner the only acceptable outcome — that of free Americans — the President made a tough decision, a painful decision, and offered something that the Venezuelans have actively sought. Specifically, it became clear in the course of negotiations that the release of two Venezuelans, Efrain Antonio Campo Flores and Francisco Flores de Freitas, sometimes referred to as the "narco nephews" due to their relationship with Nicolás Maduro's wife, was essential to securing the release of these Americans . . . .

As you may recall, the Citgo Six in particular were lured to Venezuela under false pretenses before being arrested, convicted, and held, as I mentioned, for over four years in captivity. Now, this March, March of 2022, a team across the U.S. government, led by the Special Presidential Envoy for Hostage Affairs, Roger Carstens, was able to secure the release of one of them, as well as another American wrongfully detained in Venezuela at the time. So two Americans came home in March. While we celebrated the freedom of these two Americans, we never ceased our efforts to bring home all of the wrongfully detained Americans in Venezuela.[85]

195.    The conduct of Defendants described herein at all relevant times constituted criminal acts of terrorism and torture. *See* e.g. Terrorism Risk Insurance Act of 2002, PL 107-297, November 26, 2002, 116 Stat 2322; (reprinted at 28 U.S.C. 1610, note); 8 U.S.C. 1182(a)(3)(B)(iii)(II)) (defining terrorist activity as unlawful acts of "seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained."; 18 U.S.C. § 2331 (defining international terrorism *see also* Torture Victim Protection Act, Publ. L. 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. § 1350 note (1990) (defining torture to include "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from

---

[85] White House, *Background Press Call on the Return of Americans Wrongfully Detained in Venezuela* (Oct. 1, 2022), https://www.whitehouse.gov/briefing-room/press-briefings/2022/10/05/background-press-call-on-the-return-of-americans-wrongfully-detained-in-venezuela/#:~:text=Specifically%2C%20it%20became%20clear%20in,the%20release%20of%20these%20Americans.

that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind").

196.     The Maduro Criminal Enterprise committed the criminal acts of terrorism and torture to generate funds for their narco-terrorist conspiracy and convert the lives of two American citizens into bargaining chips for the release of agents engaged in its illicit business selling drugs in United States. The price of wreaking havoc on the lives of innocent Americans was nothing to the Maduro Criminal Enterprise if it meant they could further their goal of lining the pockets of the members of their enterprise. The Plaintiffs named herein (along with the United States) were victims of and pawns in a sprawling conspiracy.

## V.     CAUSES OF ACTION

### COUNT 1:
### ANTI-TERRORISM ACT (ATA), 18 U.S.C. § 2333

#### All Plaintiffs

197.     Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

198.     Plaintiffs are U.S. nationals injured by acts of "international terrorism" defined by 18 U.S.C. § 2331 as activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

> (B) appear to be intended—
> (i) to intimidate or coerce a civilian population;
> (ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum . . . .

199.    The federal Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, provides:

**Action and jurisdiction.—** Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

200.    Defendants violated 18 U.S.C. § 2339A by providing material support to the FARC-EP, a designated foreign terrorist organization, in the plot to traffic cocaine from the Simón Bolívar International Airport, controlled by Nicolás Maduro, to the United States. The purpose of this narcotics transaction was to procure funds for the political campaign of Cilia Flores. The nephews of Nicolás Maduro and Cilia Flores, Efraín Campo and Franqui Flores, were indicted, arrested, charged, and found guilty by a jury for their participation. Efraín Campo and Franqui Flores were sentenced to eighteen years in prison.

201.    On September 9, 2020, Matthew Heath was stopped at a military checkpoint controlled by the Maduro Criminal Enterprise in Venezuela, by personnel who were not operating as legitimate state actors, but as agents for the Maduro Criminal Enterprise. Mr. Heath received fictitious charges of treason, terrorism and arms trafficking. He was kidnapped and detained in a DGCIM prison where he was tortured, interrogated, and held in solitary confinement for two years at the direction of the Maduro Criminal Enterprise.

202. On January 15, 2022, Plaintiff Osman Khan was stopped by Venezuelan military personnel who were controlled by the Maduro Criminal Enterprise and who were not operating as legitimate state actors, but as agents for the Maduro Criminal Enterprise, near the border of Venezuela and Colombia. Mr. Khan was accused of being a spy, kidnapped and detained in a DGCIM prison where he was tortured, interrogated, and held in solitary confinement for 259 days at the direction of the Maduro Criminal Enterprise.

203. Plaintiffs Matthew Heath and Osman Khan were used as leverage to bargain with the United States Government for the release and clemency of Campo Flores and Flores de Freitas. Only after months of negotiation with the United States did the Defendants release Matthew Heath and Osman Khan from wrongful detention. The Family Member Plaintiffs (Connie Haynes, Robert Heath, Devin Waller, McKenzie Daniels, I.M.H., Tania Valdes, Jasmin Khan, and A.I.K) were victims of Defendants' terroristic acts as well, suffering monetary harm and unimaginable emotional and mental harm that continues to the present, and are entitled to remedies under the Anti-Terrorism Act.

204. Mr. Heath and Mr. Khan were specifically targeted because of their status as U.S. citizens and were unlawfully detained by Defendants and for the purpose of using them as bargaining chips to negotiate with the U.S. Government.

205. Defendants' activities involved violent and dangerous acts to human life that are in violation of the criminal laws of the United States and all fifty states including the States of Florida, Tennessee, and Virginia.

206. Defendants' acts were intended to intimidate and coerce United States citizens and influence the policy of the United States Government by intimidation and coercion, and to affect the conduct of the United States government through kidnapping and torture.

207.    Defendants' activities occurred outside the territorial jurisdiction of the United States and transcend international boundaries.

208.    Defendants' acts are therefore acts of international terrorism as defined under 18 U.S.C. § 2331.  The Defendants' provision of material support to the Maduro Criminal Enterprise through the sale of narco-terrorist sales of illicit drugs in United States is an act of terrorism that gives rise to liability under the ATA.

209.    First, the narcoterrorism is dangerous to human life in the United States. *See* Maduro Indictment, *supra* note 2, at ¶ 4 ("Cartel de Los Soles, under the leadership of [Maduro] and others, prioritized using cocaine as a weapon against America").  Narcoterrorism is also dangerous to human life in Venezuela, because it funds the Maduro Regime's terrorism against political dissidents and the Venezuela civilian population.

210.    Second, the narcoterrorism violations by the Defendants violate both state and federal law prohibiting the trafficking of drugs.  Because the narcoterrorism violations were intended to fund acts of terrorism by FARC, Cartel of the Suns, and the Maduro Regime, through their various agents named herein including Minerven and PDVSA, the Defendants' trafficking also violated federal prohibitions against providing material support to terrorists.

211.    18 U.S.C. § 2339B makes it a crime to knowingly provide material support or resources to a U.S. designated foreign terrorist organization ("FTO").  The Defendants violated Section 2339B by knowingly selling narcotics—and illegal gold in violation of U.S. sanctions— in the United States (including Florida) for the benefit of FARC and providing the proceeds of narcotics and illicit gold sales from the United States (including from Florida) to the FARC, which at all relevant times was a U.S. designated FTO.

212. 18 U.S.C. § 2339C makes it a crime to knowingly provide or collect funds with the intention that the funds be used, in full or in part, to cause death or serious injury to a civilian, for the purpose of intimidating a civilian population, or for the purpose of compelling a government to take or refrain from taking an action. The Defendants violated Section 2339C by knowingly collecting funds (through sales of narcotics and illicit gold in violation of U.S. sanctions in the United States, including in Florida) for the benefit of the FARC and the Maduro regime. Defendants further violated Section 2339C by knowingly providing funds (the proceeds of narcotics and illicit gold sales in violation of U.S. sanctions from the United States, including Florida) to the FARC and Maduro regime, intending that: (1) the FARC would use the funds, in whole or in part, to cause death or injury to a civilian, for the purpose of compelling Colombia to meet various FARC demands, and for the purpose of compelling the United States to cease various anti-drug interdiction activities; and (2) the Maduro Regime would use the funds, in whole or in part, to cause injury or death to a civilian, for the purpose of intimidating Venezuela's civilian population, to compel the legitimate government of Juan Guaidó to cease its opposition to the Maduro Regime, and to compel the government of the United States to lift sanctions against Venezuela.

213. In contravention of the Anti-Terrorism Act, Defendants further used the kidnapping and captivity as leverage to intimidate and coerce the United States Government to bend to the Maduro Criminal Enterprise's will—effectuating a prisoner swap of two Maduro family members and loyalist criminal drug traffickers for the safe return of Plaintiffs Osman Khan and Matthew Heath.

214.     The kidnapping, false imprisonment, and torture of Plaintiffs Matthew Heath and Osman Khan constitute criminal actions to coerce and intimidate the United States and the people of Venezuela, therefore also constituting acts of terrorism under the Anti-Terrorism Act.

215.     Defendants' actions against Plaintiffs Matthew Heath and Osman Khan were the direct cause of the injuries suffered by the Family Member Plaintiffs.

216.     Each Family Member Plaintiff was harmed by Defendants' terrorist actions against their loved ones.

217.     Accordingly, all Plaintiffs demand judgment against Defendants for their past and future pain and suffering, anguish, emotional distress, including treble damages under 18 U.S.C. § 2333, plus interest, costs, attorney's fees, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate Plaintiffs.

### COUNT 2:
### TORTURE VICTIM PROTECTION ACT (TVPA), PUB. L. 102-256, 106 STAT. 73 (REPRINTED AT 28 U.S.C. § 1350, NOTE.)

### Plaintiffs Heath and Khan

218.     Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations set forth in all the foregoing paragraphs.

219.     The actions of the Defendants (1) Nicolás Maduro, (2) Padrino López, (3) Reverol Torres, (4) Tarek Saab, (5) Iván Hernández, (6) Diosdado Cabello, (7) Alex Saab, (8) Domínguez Ramírez, (9) Cilia Flores, (10) Reynaldo Hernández, (11) Salas Rivas, (12) and Granko Arteaga ("Individual Defendants") as described herein subjected Plaintiffs Matthew Heath and Osman Khan to kidnapping and torture within the meaning of the Torture Victim Protection Act, Publ. L. 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. § 1350 note (1990)).

220.     In carrying out these acts of injury and torture against Plaintiffs Heath and Khan, the actions of the Individual Defendants were conducted under the actual or apparent authority, or under color of law.

221.     At all relevant times, Defendant Nicolás *Maduro* Moros was the de facto President of Venezuela and commanded all Venezuelan security and military forces therein.  Defendant Tarek William Saab was the de facto Attorney General and Defendant Iván Hernández Dala was the de facto Commander of DGCIM.   These Defendants commanded the Venezuelan security and military forces therein.

222.     Plaintiffs Matthew Heath and Osman Khan were wrongfully kidnapped, detained, and tortured by Venezuelan security and military forces working for the Maduro Criminal Enterprise but under the color of law of the Venezuelan state.

223.     Pursuant to the TVPA, and the federal-question jurisdiction conferred therein, Plaintiffs do herby assert a cause of action for torture as that term is defined in the TVPA against all Individual Defendants who perpetrated or caused to be perpetrated the acts giving rise to this claim.

224.     Plaintiffs assert that there is no remedy in Venezuela and assert that pursuit of same would be futile.  The statute of limitations for the TVPA is ten years and this action is brought within the statute.

225.     The Maduro Criminal Enterprise willfully and illegally abducted Matthew Heath and Osman Khan.  The wrongful acts constitute false imprisonment and kidnapping upon the person of Matthew Heath and Osman Khan, causing personal injury to them.

226.     As a direct result and proximate result of the wrongful conduct and the willful, wrongful, intentional and reckless acts of the Individual Defendants acting in conspiracy in the

Maduro Criminal Enterprise, Plaintiffs Matthew Heath and Osman Khan were held against their will, tortured, and physically injured. Mr. Heath and Mr. Khan, as a result of their kidnapping, torture, solitary confinement and imprisonment, endured and continue to endure extreme mental anguish, physical injury, and pain and suffering, to this damage and detriment.

227. The wrongful acts committed by the Maduro Criminal Enterprise were malicious, wanton and reckless.

228. Accordingly, Plaintiffs Matthew Heath and Osman Khan assert a cause of action for their kidnapping and torture under the TVPA against Individual Defendants, who acted under color of law in their capture, imprisonment, and torture and demand judgment against Individual Defendants, for their past and future pain and suffering, anguish, emotional distress, for an amount authorized by governing law, including punitive damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate Plaintiffs.

**COUNT 3:**
**<u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>**
**<u>Tennessee Law</u>**

**Plaintiffs I.M.H., Robert Heath, Connie Haynes, Devin Waller, and McKenzie Daniels**

229. Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

230. Plaintiffs I.M.H., Robert Heath, Connie Haynes, Devin Waller, and McKenzie Daniels bring this claim for outrageous and intentional infliction of emotional distress under Tennessee law against defendants because they facilitated, assisted, aided, abetted, materially supported, and incentivized egregious acts of international terrorism, such as kidnapping and torture discussed herein.

231.     The act of kidnapping, detention and torture constituted extreme and outrageous conduct on the part of Defendants.  Plaintiff Matthew Heath was interrogated, tortured, placed in solitary confinement and denied medical treatment.  As a result of the kidnapping and imprisonment, Matthew Heath suffered and continues to suffer personal injuries and damages as a result of their torture and inhuman, illegal solitary confinement.

232.     Plaintiffs I.M.H., Robert Heath, Connie Haynes, Devin Waller, and McKenzie Daniels are the immediate family members of Plaintiff Matthew Heath.  Plaintiffs suffered from the loss of their family unit when their father/son/brother was detained for two years.  Plaintiffs suffered and continue to suffer personal injuries and damages as a result of the kidnapping and torture of Matthew Heath.

233.     Due to the nature of acts of terrorism, the family members of Matthew Heath are entitled to a claim for intentional infliction of emotional distress despite not being present at the scene.  *Murphy v. Islamic Rep. of Iran*, 740 F. Supp. 2d 51 (D. D.C. 2010); *Heiser II v. Islamic Rep. of Iran*, 659 F. Supp. 2d 20 (D. D.C. 2009).  The conduct of kidnapping and torturing Mr. Heath for months is extreme and outrageous conduct such that Defendants knew that such an act would inflict severe emotional distress on his family members.

234.     Defendants knowingly, purposefully, directly, and indirectly aided and abetted, intentionally facilitated, and/or recklessly caused the wrongful kidnapping that resulted in the emotional injuries to Plaintiffs.

235.     As a direct result and proximate result of the willful, wrongful, intentional and outrageous acts of Defendants, Plaintiffs suffered extreme emotional distress, along with ongoing pain and suffering and grief for the loss of family unit.

236.     Plaintiffs experienced emotional distress while residing in the state of Tennessee.

237.     Accordingly, and under Tennessee law, Plaintiffs do herby assert a cause of action for intentional infliction of emotional distress or outrage against Defendants, in their official and personal capacities in connection with the willful, wrongful, intentional and reckless acts of their agents in torturing and holding hostage the Plaintiffs Matthew Heath  and demand judgment against Defendants, for their past and future pain and suffering, anguish, emotional distress, and damages in an amount to be determined by a jury, including punitive damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate Plaintiffs.

### COUNT 4:
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Florida Law

**Plaintiffs Tania Valdes and A.I.K.**

238.     Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

239.     Plaintiffs Tania Valdes and A.I.K. bring this claim for outrageous and intentional infliction of emotional distress under Florida law against defendants because they facilitated, assisted, aided, abetted, materially supported, and incentivized egregious acts of international terrorism, such as kidnapping and torture discussed herein.

240.     The act of kidnapping, detention and torture constituted extreme and outrageous conduct on the part of Defendants.  Plaintiff Osman Khan was interrogated, tortured, placed in solitary confinement and denied medical treatment.  As a result of the kidnapping and imprisonment, Osman Khan suffered and continues to suffer personal injuries and damages as a result of their torture and inhuman, illegal solitary confinement.

241.     Plaintiffs Jasmin Khan and A.I.K. are the immediate family members of Plaintiff Osman Khan.  Plaintiffs suffered from the loss of their family unit when their son/brother was unlawfully detained by defendants.  Plaintiffs suffered and continue to suffer personal injuries and damages as a result of the kidnapping and torture of Osman Khan.

242.     Due to the nature of acts of terrorism, the family members of  Osman Khan are entitled to a claim for intentional infliction of emotional distress despite not being present at the scene.  *Murphy v. Islamic Rep. of Iran*, 740 F. Supp. 2d 51 (D. D.C. 2010); *Heiser II v. Islamic Rep. of Iran*, 659 F. Supp. 2d 20 (D. D.C. 2009).  The conduct of kidnapping and torturing Mr. Khan for months is extreme and outrageous conduct such that Defendants knew that such an act would inflict severe emotional distress on his family members.

243.     Defendants knowingly, purposefully, directly, and indirectly aided and abetted, intentionally facilitated, and/or recklessly caused the wrongful kidnapping that resulted in the emotional injuries to Plaintiffs.

244.     As a direct result and proximate result of the willful, wrongful, intentional and outrageous acts of Defendants, Plaintiffs suffered extreme emotional distress, along with ongoing pain and suffering and grief for the loss of family unit.

245.     Plaintiffs experienced emotional distress while residing in the state of Florida.

246.     Accordingly, and under Florida law, Plaintiffs do herby assert a cause of action for intentional infliction of emotional distress or outrage against Defendants, in their official and personal capacities in connection with the willful, wrongful, intentional and reckless acts of their agents in torturing and holding hostage the Plaintiffs Osman Khan and demand judgment against Defendants, for their past and future pain and suffering, anguish, emotional distress, and damages in an amount to be determined by a jury, including punitive damages, plus interest, costs, and such

other monetary and equitable relief as this Honorable Court deems appropriate to compensate Plaintiffs.

## COUNT 5:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## Virginia Law

### Plaintiff Jasmin Khan

247.     Plaintiff adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

248.     Plaintiff Jasmin Khan brings this claim for outrageous and intentional infliction of emotional distress under Virginia law against defendants because they facilitated, assisted, aided, abetted, materially supported, and incentivized egregious acts of international terrorism, such as kidnapping and torture discussed herein.

249.     The act of kidnapping, detention and torture constituted extreme and outrageous conduct on the part of Defendants.  Plaintiff Osman Khan was interrogated, tortured, placed in solitary confinement and denied medical treatment.  As a result of the kidnapping and imprisonment, Osman Khan suffered and continues to suffer personal injuries and damages as a result of his torture and inhuman, illegal solitary confinement.

250.     Plaintiff Tania Valdes is the immediate family member of Plaintiff Osman Khan. Plaintiff suffered from the loss of her family unit when her brother was unlawfully detained by defendants.  Plaintiff suffered and continues to suffer personal injuries and damages as a result of the kidnapping and torture of Osman Khan.

251.     Due to the nature of acts of terrorism, the family members Osman Khan are entitled to a claim for intentional infliction of emotional distress despite not being present at the scene. *Murphy v. Islamic Rep. of Iran*, 740 F. Supp. 2d 51 (D. D.C. 2010); *Heiser II v. Islamic Rep. of*

*Iran*, 659 F. Supp. 2d 20 (D. D.C. 2009). The conduct of kidnapping and torturing Mr. Khan for months is extreme and outrageous conduct such that Defendants knew that such an act would inflict severe emotional distress on his family members.

252. Defendants knowingly, purposefully, directly, and indirectly aided and abetted, intentionally facilitated, and/or recklessly caused the wrongful kidnapping that resulted in the emotional injuries to Plaintiff.

253. As a direct result and proximate result of the willful, wrongful, intentional and outrageous acts of Defendants, Plaintiff suffered extreme emotional distress, along with ongoing pain and suffering and grief for the loss of family unit.

254. Plaintiff experienced emotional distress while residing in the state of Virginia.

255. Accordingly, and under Virginia law, Plaintiff herby asserts a cause of action for intentional infliction of emotional distress or outrage against Defendants, in their official and personal capacities in connection with the willful, wrongful, intentional and reckless acts of their agents in torturing and holding hostage the Plaintiff Osman Khan and demand judgment against Defendants, for her past and future pain and suffering, anguish, emotional distress, and damages in an amount to be determined by a jury, including punitive damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate Plaintiff.

## COUNT 6:
## FALSE IMPRISONMENT

### Plaintiffs Matthew Heath and Osman Khan

256. Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

257.     Plaintiffs Matthew Heath and Osman Khan bring a claim for false imprisonment under the laws of Florida, Tennessee and/or Venezuela against Defendants Reynaldo Hernández, Marlon Salas Rivas, and Alexander Enrique Granko Arteaga who facilitated, assisted, aided, abetted, materially supported, and incentivized their unlawful detainment and torture.

258.     Defendants Salas Rivas, Reynaldo Hernández, and Granko Arteaga restrained of Matthew Heath and Osman Khan without consent or lawful cause.

259.     Defendants' unlawful detention deprived Matthew Heath and Osman Khan of their liberty and freedom.

260.      Matthew Heath and Osman Khan were unable to leave the Defendants' captivity from the moment they were unlawfully detained until their eventual release on October 1, 2022.

261.     Matthew Heath and Osman Khan suffered and continue to suffer from the physical and psychological abuse sustained during their false imprisonment, as a result of acts committed by Defendants, such as starvation, deprivation of water, electrocution, suffocation, severe beatings, denial of medical treatment, threats of death, waterboarding, unhabitable living conditions, and solitary confinement.

262.     Defendants' acts were the actual and proximate cause of Plaintiffs' harm.

263.     Accordingly, and under law, Matthew Heath and Osman Khan do hereby assert a cause of action for false imprisonment against Defendants Salas Rivas, Reynaldo Hernández, and Granko Arteaga for their willful, wrongful, and intentional captivity and demand judgment against Defendants, for their past and future pain and suffering, anguish, emotional distress, and damages in an amount to be determined by a jury, including punitive damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate Plaintiffs.

## COUNT 7:
## CIVIL RICO – 18 U.S.C. § 1962(a)-(d)

### All Plaintiffs

264. Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

265. 18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . " 18 U.S.C. § 1962(c).

266. Defendants constitute a "person" as such term is used in 18 U.S.C. § 1961(3).

267. Defendants performed "racketeering activity" as defined in 18 U.S.C. § 1961(1) by knowingly providing material support to criminal and terrorist enterprises, including, FARC-EP, Cartel of the Suns, Segunda Marquetalia, Maduro's illegitimate regime, Minerven, and PDVSA, as described above.

268. **The Enterprise.** FARC-EP, Cartel of the Suns, the Maduro Regime, including all named individual Defendants PVDSA, and Minerven form an association in fact for the common and continuing purpose described here, *i.e.*, for purpose of exerting unlawful authoritarian control over Venezuela, furthering the Maduro Criminal Conspiracy and engaging in (a) narcotics trafficking; (b) narco-terrorism and other terrorism against the United States and its citizens; (c) illegal gold trafficking and sale in violation of United States sanctions, (d) acts of terrorism designed to intimidate Venezuela civilian population, including kidnapping, torture, arbitrary detention, "disappearances," and murder; (e) public corruption offenses including foreign exchange scams that rely on the artificially inflated value of the bolívar on Venezuela's official currency exchanges; and (f) money laundering. The Maduro Criminal Enterprise

constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. The members of the enterprise, including each of the named Defendants herein, functioned as continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. The Maduro Criminal Enterprise is the poster child for what Congress had in mind when it created a civil RICO remedy: a well-organized, long standing, hierarchical crime syndicate engaged in myriad violent criminal endeavors.

269.     In the alternative FARC, Cartel of Suns, and Maduro Regime (including PVDSA, Minerven, and all individually named Defendants) each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Alternative Enterprises").

270.     Defendant Maduro, including the agents, officials, officers, and employees of Maduro whose attributable conduct in support of FARC-EP, Cartel of the Suns, Segunda Marquetalia, Minerven, and PDVSA, were associated in fact with a common purpose of maintaining the Maduro Regime's control of Venezuela and increasing capital for personal gain, through acts of corruption, drug smuggling, money laundering, kidnapping, and torture, constituted an "enterprise" as the term is defined in 18 U.S.C. § 1961(4), which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce.

271.     Defendants constitute an "enterprise" because all members thereof had the same goal of remaining in power in Venezuela and generating illicit funds, and in fact worked together to achieve that goal.

272.     Defendants committed two or more acts of racketeering activity within ten years of one another through various acts, including the kidnapping of Matthew Heath in or about September 2020 and Osman Khan in or about January 2022 and repeated torture of Mr. Heath and

Mr. Khan, thereby committing a "pattern" of racketeering activity as defined in 18 U.S.C. § 1961(5).

273.     Defendants, as principals, agents of, and co-conspirators with FARC-EP, Cartel of the Suns, Segunda Marquetalia, Minerven, and PDVSA, used and invested, both directly and indirectly, the income and proceeds of the pattern of racketeering activity, to establish the enterprise in violation of 18 U.S.C. § 1962(a).

274.     Defendants, as principals, agents, and co-conspirators, maintained, directly and indirectly, an interest in and control of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b).

275.     Defendants, as principals, agents, and co-conspirators, conducted and participated directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

276.     Defendants, as persons associated with the enterprise, which engaged in acts of racketeering activity which affected interstate and foreign commerce, did conspire with other persons known and unknown, to violate 18 U.S.C. § 1962(d).

277.     Defendants violated 18 U.S.C. § 1962(a-d) by investing in, maintaining an interest in, conducting and participating, directly and indirectly, or by conspiring to do the same, in the enterprise through a pattern of racketeering activity, that is, through multiple acts indicatable under the laws of the United States, including but not limited to:

      (a) 18 U.S.C. § 1203 (hostage taking)

      (b) 18 U.S.C. § 1956 (money laundering);

      (c) 18 U.S.C. § 2339A (material support to organizations engaged in violent activities);

(d) 18 U.S.C. § 2339B (material support to designated foreign terrorist organizations); and

(e) 21 U.S.C. § 841 (drug trafficking).

278.    The damages suffered by Plaintiffs, as described herein, were the direct and proximate result of the aforesaid pattern of racketeering activity by defendants, acting individually and in concert with other members of the enterprise.

279.    The loss of business and property by plaintiffs included loss of tangible and intangible personal property, loss of employment, personal effects, pecuniary losses, past and future wages and profits, business opportunities, and personal property.

280.    Accordingly, Plaintiffs demand judgment against Defendants, for an amount authorized by governing law to be determined by a jury, including treble damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate Plaintiffs.

## COUNT 8:
## DEFAMATION AND DEFAMATION *PER SE*
### *Florida Law*

### Plaintiffs Matthew Heath and Osman Khan

281.    Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

282.    Pursuant to Florida Law, a plaintiff may recover under a claim of defamation if (1) "the defendant published a false statement"; (2) "about the plaintiff"; (3) to a third party"; and (4) "that the falsity of the statement caused injury to the plaintiff." *Matonis v. Care Holdings Grp., L.L.C.*, 423 F. Supp. 3d 1304, 1315 (S.D. Fla. 2019) (Quoting *Alan v. Wells Fargo Bank, N.A.*, 604 Fed. App'x. 863, 865 (11th Cir. 2015)).

283.     Statements qualify as defamation per se action when "(1) charge that a person has committed an infamous crime; (2) tend to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tend to injure one in his trade or profession. *Id*.

284.     On September 14, 2020, Defendant Tarek Saab—acting as an agent of the Maduro Criminal Enterprise—published a false statement about Matthew Heath when he said on Venezuelan national television that Mr. Heath was captured because he was in Venezuela to sabotage and engage in destabilization activities against Venezuelan refineries.  He further falsely stated that Matthew Heath planned to obtain strategic information from the Amuay Refining Complex to carry out sabotage, attacks against military units, and to engage in illicit drug trafficking from Colombia to Aruba, using Venezuelan territory to support the "aggression" and "discrediting" campaign of the United States Government.  Defendants accused Mr. Heath of committing crimes of terrorism, arms trafficking, and criminal association, which Defendants were aware were untrue.

285.     Defendants' false statements are defamation *per se* because they accuse Mr. Heath of several infamous crimes (e.g., terrorism) and such a falsehood tends to subject one to hatred, distrust, ridicule, contempt, or disgrace.

286.     Tarek Saab's Venezuelan Television broadcast was published live on air on Venezuelan State Television and reported on and reproduced many times in both Spanish and English language publications and remains available to access on YouTube today.

287.     The defamatory statements were published in Florida. The Miami Herald, a Florida-based publication, republished Defendants' false statements, stating "The Heath arrest was framed as a terrorism case from the start, with the regime claiming it had disrupted a covert operation to sabotage power plants and oil facilities in an attempt to destabilize the government . . . . Tarek

William Saab described Heath as a mercenary and alleged that a number of items he held connected him to the Central Intelligence Agency. 'A U.S. citizen and presumed military soldier was found carrying out espionage activities to destabilize Venezuelan territory,' Saab said when announcing Heath's arrest."[86]

288.    On information and belief, Tarek Saab's false statement that Mr. Heath had committed crimes including terrorism was viewed by persons in South Florida including members the large population of Venezuelan ex-patriots in South Florida, who were among the Maduro Criminal Enterprise's intended audience.

289.    Tarek Saab made the false statements that Matthew Heath had committed terrorism, arms trafficking, and was there to sabotage and discredit Venezuela with the specific intent to harm Mr. Heath's reputation.   The Maduro Criminal Enterprise wished to distract and mislead Venezuelans, the international community, and especially the United States for the purpose of distracting from their own role in mismanaging the country's economy, and to move the spotlight away from the Maduro Criminal Enterprise's own foreign exchange scams, narco-terrorism, and ongoing criminal conspiracy.   Defendants further intended to discredit Mr. Heath with these statements to serve as a pretense to hold him captive so that his captivity could be used as leverage against the United States government.

290.    On or about January 17, 2020, shortly after Osman Khan was captured by agents of the Maduro Criminal Enterprise, Mr. Khan's mother, Plaintiff Valdes, received a call from Mr. Khan's captors, extorting money from his family, but also committing defamation *per se* by telling her that her son, Osman Khan, was being held because he committed acts of terrorism, human

[86] Kevin G. Hall et al., *Family of Retired U.S. Marine Accused of Terrorism in Venezuela Awaits Word on His Fate*, Miami         Herald         (June         16,         2021),         https://www.miamiherald.com/news/nation-world/world/americas/venezuela/article252154378.html

trafficking, and conspiracy—infamous crimes that Defendants and their agents were fully aware Mr. Khan never engaged in. Defendants made these false statements for the same reason they were made against Matthew Heath—to intentionally discredit Mr. Khan's reputation and as a pretense to hold him captive to intimidate and extort money from Osman's family and to use as leverage to influence the United States Government.

291.     Defendants' actions in falsely accusing Mr. Khan of crimes they had full knowledge he had not committed resulted in ramifications that harmed Mr. Khan and his family in Florida. At least one publication, CWV printed in Spanish that Mr. Khan was "an American ex-convict," an untrue statement perpetuating the lies of Defendants regarding Mr. Khan which has affected his social and professional life and harmed his family.[87]

292.     These untrue statements concerning Mr. Khan were published in English and Spanish language print and website publications, and on information and belief, Defendants' false statement that Mr. Khan had committed crimes including terrorism was viewed by persons in South Florida including members the large population of Venezuelan ex-patriots in South Florida, who were among the Maduro Criminal Enterprise's intended audience.

293.     These statements made by Defendants about Plaintiffs Matthew Heath and Osman Khan were false, as neither Plaintiff engaged in any criminal conduct—including terrorism, conspiracy, or human trafficking—nor tried to attack or destabilize the Venezuelan system.

---

[87] Yessenia Avitia, *Defensor público del condado de Los Ángeles, acusado de ser espía de EE.UU., detenido en Venezuela – Telemundo 52*, CWV (January 27, 2023), https://www.cwv.com.ve/defensor-publico-del-condado-de-los-angeles-acusado-de-ser-espia-de-ee-uu-detenido-en-venezuela-telemundo-52-2/. ("Familiares, amigos y colegas realizaron una vigilia con velas por Hernández el miércoles para crear conciencia sobre su situación. En el velorio estaba Osman Khan, un ex convicto estadounidense que dijo que estaba en prisión con Hernández. Khan fue liberado en un intercambio de prisioneros en octubre pasado." English Translation: "Family, friends and colleagues held a candlelight vigil for Hernandez on Wednesday to raise awareness about his situation. At the wake was Osman Khan, an American ex-convict who said he was in prison with Hernandez. Khan was freed in a prisoner exchange last October.").

294.    These false statements about both Matthew Heath and Osman Khan were available on internationally available media, including on the internet.  On information and belief, these false statements were viewed by the persons in Florida, including members the large population of Venezuelan ex-patriots in South Florida, who were among the Maduro Criminal Enterprise's intended audience.

295.    The foregoing false statements about Plaintiffs Matthew Heath and Osman Khan were made by individuals, including Defendant Tarek Saab, as agents of Maduro and the larger Maduro Criminal Enterprise.

296.    As a result of Defendants' actions, Plaintiffs suffered pain and suffering, anguish, and emotional distress.

297.    Pursuant to Florida law, Plaintiffs demand judgment against Defendants, for an amount determined by a jury, including punitive damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate Plaintiffs.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests joint and several judgments against the Defendants on all Counts enumerated herein, including but not limited to:

298.    Awarding to Plaintiffs compensatory, economic, pain and suffering and solatium damages against Defendant in amounts set forth herein and as shall be determined by this Court or at trial;

299.    Awarding to Plaintiffs punitive or exemplary damages against Defendants, jointly and severally;

300.    Awarding to Plaintiffs pre-judgment interest and post-judgment interest on all damages awards computed and calculated at the maximum rate allowable by law;

301.    Awarding to Plaintiffs treble damages pursuant to 18 U.S.C. § 2333 against each

Defendant;

302.    Awarding to Plaintiffs for any and all costs sustained in connection with this action,

including attorneys' fees, pursuant to 18 U.S.C. § 2333; and

303.    Granting any and all such further relief as the Court may deem just and proper.

## VII.  JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated: January 6, 2025                  Respectfully submitted,

*/s/ John A. Thornton*
John Thornton
**do Campo & Thornton, P.A.**
150 S.E. 2nd Avenue, Suite 602
Miami, FL 33131
(305) 358-6600
jt@dandtlaw.com

Michael Pendell (*pro hac vice forthcoming*)
**MOTLEY RICE LLC**
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 882-1681
mpendell@motleyrice.com

John Eubanks (*pro hac vice forthcoming*)
jeubanks@motleyrice.com
Annie E. Kouba (*pro hac vice forthcoming*)
akouba@motleyrice.com
**MOTLEY RICE LLC**
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
(843) 216-9000

Patrick Barrett (*pro hac vice forthcoming*)
**PROVOST UMPHREY LAW FIRM, LLP**
Hobbs Building, Suite 303
4205 Hillsboro Pike
Nashville, TN 37215

(615) 297-1932
pbarrett@pulf.com

*Attorneys for Plaintiffs*